POWERS v DETROIT AUTOMOBILE INTER-INSURANCE
EXCHANGE

DEYARMOND v COMMUNITY SERVICE INSURANCE COMPANY

AUTO CLUB INSURANCE ASSOCIATION v NICHOLSON

SCHIEBOUT v CITIZENS INSURANCE COMPANY OF AMERICA

DENNISON v WISNIEWSKI

Docket Nos. 73156, 73691, 74136, 76091, 76427. Argued June 3, 1986
(Calendar Nos. 1-5). Decided December 30, 1986.

The following cases involve refusals by insurers to provide resi-
dual liability coverage to insured persons on the ground that
the vehicles involved in the accidents in each case were neither
"owned" nor "nonowned" automobiles as defined in the policies
and therefore not covered.

Wanda M. Powers brought an action in the Wayne Circuit Court
against Detroit Automobile Inter-Insurance Exchange, seeking
uninsured motorist's benefits under her mother's policy for
injuries sustained while she was an occupant of her sister's
parked, uninsured automobile which was struck by an unin-
sured van. Both Wanda Powers and her sister lived with their
mother. The court, Irwin H. Burdick, J., granted summary
judgment for the plaintiff, finding that the owned-vehicle provi-
sion in the policy under which the defendant would exclude
coverage for the sister's vehicle was ambiguous, leading to
misrepresentation of the actual coverage and confusion of the
insured. The Court of Appeals, J. H. GILLIS, P.J., and GRIBBS
and GAGE, JJ., affirmed in an unpublished opinion per curiam
(Docket No. 66446). The defendant appeals.

Ester Deyarmond brought an action for declaratory judgment in
the Montcalm Circuit Court against Community Service Insur-
ance Company. She was a defendant in several wrongful death
actions arising from an accident which occurred when one of
her sons was driving her car. Mrs. Deyarmond was also the
named insured in a policy declaring coverage for a car owned
by another son. Both sons resided with the plaintiff at the time
of the accident. The court, Charles W. Simon, Jr., J., granted
summary judgment for the plaintiff, finding residual liability
coverage. The Court of Appeals, DANHOF, C.J., and MACKENZIE

and DODGE, JJ., reversed in an opinion per curiam, holding that the trial court erred in disregarding the definition of a nonowned automobile in the Community policy which would exclude coverage (Docket No. 68901). The plaintiff appeals.

Auto Club Insurance Association brought an action in the Macomb Circuit Court against William D. Nicholson, personal representative of the estate of Paul Nicholson, deceased, pursuant to the terms of a consent judgment in a wrongful death action. Nicholson was killed in an accident involving an automobile owned by Karen Kron and driven by her brother, Keith. Both Keith and Karen lived with their parents at the time of the accident. The Auto Club sought a declaration regarding the applicability and coverage of two policies issued to the parents covering their separate automobiles. The court, Kenneth N. Sanborn, J., granted summary judgment for the plaintiff, finding the policies issued to the parents not applicable. The Court of Appeals, ALLEN, P.J., and V. J. BRENNAN and N. J. KAUFMAN, JJ., affirmed in an opinion per curiam (Docket Nos. 70250, 70251). The defendant appeals.

Herman J. Schiebout brought an action in the Kent Circuit Court against Citizens Insurance Company of America, seeking a declaration regarding the applicability of a policy issued by Citizens covering his personal automobiles to an accident which occurred while he was driving an uninsured dump truck owned by his brother-in-law. The court, George V. Boucher, J., granted summary judgment for the plaintiff. The Court of Appeals, MACKENZIE, P.J., and V. J. BRENNAN and ROBINSON, JJ., affirmed (Docket No. 74599). The defendant appeals.

Robert Dennison, for himself and as next friend of Alana Dennison, and Alana Dennison brought an action in the Wayne Circuit Court against Myron Wisniewski and Auto Club Insurance Association, seeking damages for injuries sustained when the motorcycle on which Robert Dennison was a passenger was struck by an automobile driven by Myron Wisniewski and owned by his father, Mitchell Wisniewski. Both father and son had policies of insurance, and the insureds and the insurer agreed that the policies were applicable and could be stacked. The insurer asserted, however, that only the minimum coverage required by law would be paid, rather than the higher liability coverage provided by the terms of Myron Wisniewski's policy. The court, Arthur M. Bowman, J., granted summary judgment for the defendant. The Court of Appeals, M. J. KELLY, P.J., and GRIBBS and KNOBLOCK, JJ., reversed in an unpublished opinion per curiam (Docket No. 75723). Auto Club appeals.

In an opinion by Chief Justice WILLIAMS, joined by Justice

Archer, with Justices Brickley and Cavanagh concurring in the result only, the Supreme Court *held:*

Liability coverage may not be excluded in these cases.

Chief Justice Williams, joined by Justice Archer, stated that an owned-automobile exclusion in a policy of insurance is not repugnant per se to the no-fault act. A no-fault insurer may exclude residual liability coverage for otherwise-insured resident family members when they drive vehicles owned by themselves or other resident family members which are not described in the policy, so long as the exclusion is clearly and unambiguously stated. In these cases, the insurers' method of exclusion—by definition of terms at variance with the common meaning which most policyholders would consider clear without definition—renders the exclusions invalid as ambiguous, not made clear, technical constructions. The liability coverage to be applied is the amount contracted for and is not limited to the minimum coverage required by law.

1. A no-fault insurer is required to pay medical and work-loss expenses incurred by its policyholders resulting from automobile accidents without regard to fault. In cases of serious injury or death, victims of traffic accidents may still sue negligent drivers in tort for noneconomic damages. In consequence of this residual tort liability, the no-fault act requires motor vehicle owners to maintain insurance against the possibility that they will be found liable.

2. An owned-vehicle exclusion is not repugnant to the no-fault act. Exceptions in an insurance policy to the general liability provided for are to be strictly construed against the insurer, and any ambiguities will be construed in favor of the insured. An insurer must draft a policy to make clear the extent of nonliability under an excusion clause and may not escape liability through forced construction of the language of a policy when all question might have been avoided by a more generous or plainer use of words. An insurer may not prominently make a promise of coverage and then less prominently attempt to contradict that promise in whole or in part in the body of the policy.

3. The policies in these cases grant coverage for the named insured and for household relatives while driving owned or nonowned automobiles. In plain English, the coverage would appear to be total. Although the policies contain exclusion sections, the exclusion claimed by the insurers, i.e., that automobiles not insured under the policies which are owned by or furnished for the regular use of resident members of the family are not covered (the "owned automobile" exclusion), is not

contained in those sections. The combined effect of the rules of construction of insurance policies invalidates these exclusions. An insurer, by artful definition of terms at variance with commonly understood meanings and by failure to speak plainly and clearly, may not effect an exclusion of coverage.

4. Nor may the owned-automobile exclusion in these cases be used to prevent stacking of coverage where an insured is driving an automobile owned by a resident relative, or to exclude uninsured motorist coverage.

5. Because in these cases the owned-automobile exclusions are invalidated not because they are void as contrary to statutory policy, but because of improper drafting, the liability coverage is that contracted for and is not limited to the statutory minimum.

6. In *Schiebout, Deyarmond,* and *Nicholson,* the exclusion was not clearly stated and is void. In *Powers,* the exclusion in optional uninsured motorist coverage is likewise void. In *Dennison,* the applicable limit of residual liability coverage is that provided by the policy.

Justices BRICKLEY and CAVANAGH concurred in the result only.

*Powers, Schiebout,* and *Dennison,* affirmed.

*Deyarmond* and *Nicholson,* reversed.

Justice RILEY, joined by Justice BOYLE, concurring in part and dissenting in part, would hold the nonowned-automobile exclusion enforceable as neither ambiguous nor contrary to the provisions of the no-fault act.

Justice LEVIN, concurring in part and dissenting in part, stated that the household exception to automobile liability and uninsured motorist coverage is not invalid per se, but may be invalid as sought to be applied in a particular case.

140 Mich App 804; 366 NW2d 45 (1985) affirmed.

132 Mich App 191; 347 NW2d 201 (1984) reversed.

142 Mich App 168; 368 NW2d 875 (1984) reversed.

*William J. DeBiasi, P.C.* (by *William M. DeBiasi*), for plaintiff Powers.

*Goggin & Baker* (by *William E. Goggin*) for plaintiff Deyarmond.

*Dickinson, Brandt, Hanlon, Becker & Lanctot* (by *Ronald R. Hanlon*); (*Gromek, Bendure &*

*Thomas,* by *Nancy L. Bosh,* of counsel) for plaintiff Auto Club Insurance Association.

*Schenk, Boncher & Prasher* (by *Frederick J. Boncher* and *Dan E. Bylenga, Jr.)* for plaintiff Schiebout.

*Bockoff & Zamler, P.C.* (by *Daryl Royal* and *Thomas C. Miller),* for plaintiffs Dennison.

*Dickinson, Brandt, Hanlon, Becker & Lanctot* (by *Cynthia L. Geller); (Gromek, Bendure & Thomas,* by *Daniel J. Wright,* of counsel) for defendant Detroit Automobile Inter-Insurance Exchange.

*Nelson & Kreuger, P.C.* (by *Steven L. Kreuger),* for defendant Community Service Insurance Company.

*York & Dolan, P.C.* (by *John A. Dolan),* for defendant Nicholson.

*Bremer, Wade, Nelson & Alt* (by *Michael D. Wade* and *Phillip J. Nelson)* for defendant Citizens Insurance Company of America.

*Dickinson, Brandt, Hanlon, Becker & Lanctot* (by *Eugene R. Hom); (Gromek, Bendure & Thomas,* by *John A. Lydick,* of counsel) for defendant Wisniewski and garnishee-defendant Auto Club Insurance Association.

WILLIAMS, C.J. In these five cases we again consider the validity of the so-called "owned vehicle" exclusion in policies of no-fault automobile insurance.

The claimants in these cases are all insureds under the terms of the policies at issue, in one case because the claimant is the named policyholder and in the remaining cases because the

policies cover the claimants as relatives residing in the same household as the policyholder.

The policies state that coverage is provided to insured persons while driving "the owned automobile" and also while driving "a nonowned automobile." The claimants contend that they were each involved in an automobile accident while occupying a nonowned automobile, specifically one owned by a relative residing in the household which was not the vehicle described in the policy in question. The sole exception is the *Schiebout* case, in which the accident vehicle was owned by a nonresident brother-in-law.

The insurance companies refuse to pay benefits because they claim that the policy definitions of the terms "owned automobile" and "nonowned automobile" exclude insured persons from coverage under the above circumstances. While the policies cover both owned and nonowned automobiles, the insurers state that the cars involved in these accidents do not fit in either category, according to the policy definitions.

## I. OVERVIEW

These cases present an interesting problem. The opposing parties, in effect, claim to construe as clear and unambiguous the insurance policies containing the so-called owned-automobile exclusion provisions, with dramatically different results. What is so interesting is that from the perspective of each party, there is demonstrable justification for its position. The claimants argue, somewhat paradoxically, that the exclusion is ambiguous—and therefore void—for the very reason that there are two viable interpretations.

The two viable interpretations are as follows: First, the claimants contend they are entitled to understand plain and common English for its nor-

mal and regular meaning.[1] Second, the insurers claim that, if the insurance policy is read in its entirety and construed with understanding, the words are subject to clear and unambiguous definitions which give them a meaning other than the normal and regular meaning perceived by the claimants.

This Court, in approaching the problem, must recognize an insurance contract for what it is. It is not a hard-bargained contract drafted after mutual consideration of the positions of two negotiators with equal or substantially equal skills and resources. What is involved is a contract of adhesion, a take-it-or-leave-it insurance policy not drafted by the buyer or even by the seller of the policy, but by insurance and legal experts of a state, national, or international organization, hundreds and maybe thousands of miles away. It is fatuous to suppose the policy owner had any part in the language of the policy besides filling in the blanks, and the problem in question involves not the blanks, but the established text of the printed form.

The common wisdom is that very few insurance policy purchasers read all or even substantially all of the purchased contract, and it is not guaranteeable that they would understand it if they did. That is not to say that most reasonably competent lawyers with sufficient time, or "insurance specialist" lawyers in shorter time, couldn't read and understand the policy. However, we do not believe that it is being argued that it would be in the public or any special interest to assume that the purchase of liability insurance for an automobile should require the assistance and cost of an attorney.

The contentions of the two parties ultimately

---

[1] See *State Farm Mutual Automobile Ins Co v Ruuska,* 412 Mich 321, 347; 314 NW2d 184 (1982) (opinion of LEVIN, J.).

boil down to this. The claimant says, the policy in question provides that I am an insured, that the accident is the kind of accident covered, that coverage is provided for such an accident occurring in an owned vehicle or in a nonowned vehicle, and that since "owned" and "nonowned" are common and well-understood English terms, a vehicle must be either owned or nonowned and therefore I am covered.

Not so, says the insurance company. It is true the claimant is an insured and the kind of accident is the type covered, but it is not true that every vehicle is an owned vehicle or a nonowned vehicle. The insurance company then points out that if the policy is carefully read, it will be discovered that in the definitions section of the policy there is a special definition for "nonowned automobile" that reads as follows:

"[N]on-owned automobile" means an automobile or trailer not owned by or furnished for the regular use of either the named insured or any relative.[2]

The insurance company states that if this definition is carefully read and then read in connection with the definition of "relative," it will be seen that indeed there is another category beyond owned and nonowned automobiles. The claimants in these cases were not in either an owned or a nonowned automobile, but were in a different category of automobile altogether, and thus insurance coverage was excluded.

It is difficult to deny that both parties make a persuasive case from their particular perspectives. Further, it should be noted that there is no argu-

---

[2] This language is typical of these policies, but not necessarily the same in all the policies.

ment that, if properly drafted, some or all of the owned-automobile exclusion isn't reasonable public policy. For example, there is no good reason why the insurance industry shouldn't protect itself and its insureds against higher rates by avoiding such risks as policyholders who knowingly try to make a policy intended to cover one car cover two, or a low-risk policy cover a low- and a high-risk as well.[3] Protecting against such unpaid-for risks is undoubtedly in the public interest, but that still doesn't justify such exclusions if they are not clear and properly brought to the policy buyer's attention. It becomes the Court's duty, therefore, to determine what the law, justice, and public policy require.

## II. ISSUES AND HOLDING

The issues we decide today are:

I. Under the no-fault statute, may an insurance policy exclude residual liability coverage for an insured driving a vehicle not named in the policy which is owned by a resident family member?

II. Is the owned-vehicle exclusion in these cases (a) ambiguous, (b) made clear, (c) a technical construction, and (d) contrary to the insured's reasonable expectations?

III. If the owned-vehicle exclusion is invalid, should the insurer be liable for only the amount of residual liability coverage required by law, or for the amount provided for in the insurance contract?

We would hold:

I. The owned-automobile exclusion is not repug-

---

[3] Also see *Ruuska, supra* at 343, 351 (opinion of LEVIN, J.).

nant per se to the no-fault act, and that insurance policies may therefore exclude residual liability coverage for otherwise-insured resident family members when they drive vehicles owned by other resident family members and not described in the policy.

II. In these cases, the insurers' method of exclusion—by the definition of terms at variance with their common meaning, which most policyholders would consider clear without definition—renders it invalid as (a) ambiguous, (b) not made clear, (c) a technical construction, and (d) contrary to the reasonable expectations of the insured reading the insurance contract.

III. The liability coverage to be applied is the amount contracted for, and is not limited to the minimum coverage required by law.

### III. INTRODUCTION TO ISSUES I AND II

Three of the cases we consider today, *Schiebout, Deyarmond,* and *Nicholson,* involve those sections of the subject insurance policies providing for coverage of "residual tort liability." Because the other two cases, *Powers* and *Dennison,* involve different issues, we will treat those cases separately, as well as a secondary issue in *Nicholson,* which will be considered with the main issue in *Dennison.*

Under the basic no-fault scheme, insurers are required to pay medical and work-loss expenses incurred by their policyholders resulting from automobile accidents without regard to fault. MCL 500.3105; MSA 24.13105. In cases of serious injury or death, however, victims of traffic accidents may still sue negligent drivers in tort for noneconomic damages. MCL 500.3135; MSA 24.13135. In consequence of this so-called "residual tort liability,"

the no-fault act requires motor vehicle owners to maintain insurance against the possibility that they will be found liable. MCL 500.3101(1); MSA 24.13101(1).

These no-fault insurance policies provide coverage for the "named insured" and relatives residing in the same household. The insurers intend to provide coverage for the family members' occasional use of automobiles owned by persons outside the family and outside the home, but to exclude coverage for the family members' use of automobiles "owned by or furnished for the regular use of," resident members of the family, other than the car specifically insured by the policy. The insurer's understandable purpose in excluding coverage in these situations is to avoid a situation in which a person obtains a high level of liability coverage for one automobile in the family, and seeks to use that greater protection to cover liability incurred while the insured is driving a family car with a lower level of coverage or no coverage.

Another purpose for the exclusion of coverage when an insured is driving a vehicle owned by another household member is to prevent "stacking," that is, recovery from more than one policy in cases in which a person is insured under several family policies.

The insurers here have attempted to both exclude this "free-ride" insurance coverage and stacking by the so-called owned-automobile exclusion method. The policies grant coverage for the named insured and for household relatives while driving an owned or a nonowned car, which, in plain English appears to be totally comprehensive coverage. Although the policy contains a section entitled "Exclusions," the exclusion at issue here is not contained in that section. The insurers, however, claim exclusion is accomplished by defin-

ing the common and generally clearly understood term "nonowned" in such a way as to refer to less than all nonowned automobiles.

The claimants argue that, because the no-fault act, MCL 500.3101 *et seq.;* MSA 24.13101 *et seq.,* requires residual liability coverage, MCL 500.3131; MSA 24.13131, the exclusion is repugnant to the statute and must be struck down. Alternatively, they argue that the exclusion must be rejected because it is ambiguous and unclear and also because it defeats the policyholders' reasonable expectations.

### IV. FACTS FOR ISSUES I AND II

*Schiebout v Citizens Insurance*

Herman Schiebout owned two automobiles which were insured by the defendant. Mr. Schiebout's brother-in-law owned a business, the Recreational Center of Kent, Inc. The business owned a dump truck which Mr. Schiebout was allowed to use whenever he wished and did use an unspecified number of hours. In the winter of 1980-81, Mr. Schiebout used the dump truck to move a house, and then parked it at his home for the remainder of the winter. On May 21, 1981, he took the truck on the road to see if it would run after having been idle for several months. The truck's brakes failed and it collided with another vehicle, resulting in injuries to Margaret and Diane Bowers. The dump truck was not insured. When the Bowerses brought suit against Schiebout, he brought an action for declaratory judgment to determine the applicability of his policy with the defendant on his own automobiles, which contained an owned-vehicle exclusion. The trial court held that the accident was covered by Mr. Schiebout's policy.

The Court of Appeals affirmed, 140 Mich App 804; 366 NW2d 45 (1985), and this Court granted leave to appeal, 422 Mich 973 (1985).

*Deyarmond v Community Service Insurance*

On September 12, 1980, William Deyarmond was involved in an automobile accident which took the lives of five members of the Houghton family. William was driving an automobile owned by his mother, Ester, and insured by Citizens Insurance Company. At the time of the accident, William was living with his mother and his brother, Steven. Steven owned an automobile which was insured in his mother's name by the defendant, Community Service Insurance.

Wrongful death actions have been brought against William and Ester Deyarmond by the five Houghton estates. Citizens tendered its policy limits of $40,000. Ester Deyarmond brought a declaratory judgment action seeking additional coverage under her policy covering Steven's car. The defendant, Community Service Insurance, claimed coverage was unavailable due to the policy's owned-automobile exclusion. The trial court found for the plaintiff. Following this Court's denial of defendant's application for leave to appeal prior to decision by the Court of Appeals, the Court of Appeals reversed, 132 Mich App 191; 347 NW2d 201 (1984).

We first held the case in abeyance for *DAIIE v Widling,* 420 Mich 549; 362 NW2d 227 (1984). Following the decision in that case, we granted leave to appeal, 422 Mich 973 (1985).

*Auto Club Insurance Association v Nicholson*

Paul Nicholson was one of three persons killed

in an automobile accident which occurred on October 8, 1978. The driver was Keith Kron, who was operating an automobile owned by his sister, Karen. At the time of the accident, Keith and Karen were living with their parents, Gaylord and Jeannette, both of whom owned automobiles. All three family vehicles were insured in separate policies with the Auto Club.

Nicholson's estate commenced a wrongful death action against Keith and Karen Kron. After litigation, the parties entered into a consent judgment which provided that the Auto Club defendant would pay the policy limits on the policy insuring Karen Kron's car and would seek a declaratory judgment regarding the coverage of the parents' policies. In this declaratory action, the circuit court held that the parents' policies did not cover the accident, because of the owned-automobile exclusion, and the Court of Appeals affirmed, 142 Mich App 168; 368 NW2d 875 (1984). After holding the case in abeyance for *Widling, supra,* this Court granted leave to appeal, 422 Mich 973 (1985).

### V. ISSUE I: IS THE OWNED-VEHICLE EXCLUSION REPUGNANT TO THE NO-FAULT ACT?

This Court considered the issue of the owned-vehicle exclusion in *State Farm v Ruuska,* 412 Mich 321; 314 NW2d 184 (1982). Three justices in that case would have held that the exclusion was repugnant to the no-fault act. Three other justices were of the opinion that the exclusion was permitted under the act and was, furthermore, unambiguous and should be enforced as written. Justice LEVIN wrote a separate opinion in which he concluded that, although the no-fault act permitted such an exclusion, the exclusion in that particular case was void because, by defining a commonly

understood term in an uncommon way the insurer defeated the policyholder's reasonable expectations.

Since four justices of the *Ruuska* Court held through the opinions of Chief Justice COLEMAN and Justice LEVIN that exclusion of household vehicles from liability coverage was not contrary to the no-fault statute, that issue was conclusively resolved by that decision. We have been presented no reason or policy to reconsider that holding.

*Ruuska* also held, through the opinions of Justices WILLIAMS and LEVIN that stacking was permitted. In that case, the daughter lived in her father's household and was involved in an accident driving her father's car. The result in *Ruuska* allowed the stacking of the father's policy and the daughter's policy. That issue is not before us.

## VI. ISSUE II: IS THE OWNED-VEHICLE EXCLUSION (A) AMBIGUOUS, (B) MADE CLEAR, (C) A TECHNICAL CONSTRUCTION, AND (D) CONTRARY TO THE REASONABLE EXPECTATIONS OF THE INSURED?

Left unresolved by the *Ruuska* Court is the question we consider today: whether the insurers in these cases may exclude liability coverage for vehicles owned by resident family members by means of a separate and unreferenced limiting definition of the plain English terms, "owned" and "nonowned automobiles"[4] so that "nonowned automobile" means less than all nonowned automobiles.

### A. PERTINENT INSURANCE PROVISIONS

In these cases, the drivers of the automobiles

---

[4] Since the three justices who would have found the exclusion invalid under the statute did not reach the issue, the three-to-one split among the remaining justices did not result in a majority on that issue.

involved in the accidents were insured under the terms of the policies at issue. In *Deyarmond* and *Nicholson,* the drivers were insured because they were relatives of the named insured living in the same household. In *Schiebout,* the driver was the named insured.

The policy language of the four policies at issue in these three cases is substantially similar. The language of the Deyarmond policy is illustrative. Under the general heading of "Part I—Liability," the first section is headed:

Coverage A—Bodily Injury Liability . . . .

[The insurer agrees] [t]o pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of:

A. bodily injury, sickness or disease, including death resulting therefrom, hereinafter called "bodily injury," sustained by any person; . . . arising out of the ownership, maintenance or use of the owned automobile or any non-owned automobile . . . .

\* \* \*

Persons Insured: The following are insureds under Part I:

(a) with respect to the owned automobile,

(1) the named insured and any resident of the same household,

\* \* \*

(b) with respect to a non-owned automobile,

(1) the named insured,

(2) any relative . . . .

\* \* \*

Definitions: Under Part I:

\* \* \*

"relative" means a person related to the named insured by blood, marriage or adoption who is a resident of the same household . . . .

\* \* \*

"owned automobile" means

(a) a private passenger, farm or utility automobile described in this policy for which a specific premium charge indicates that coverage is afforded.

\* \* \*

"non-owned automobile" means an automobile or trailer not owned by or furnished for the regular use of either the named insured or any relative . . . .

\* \* \*

Exclusions: This policy does not apply under Part I:

(a) to any automobile while used as a public or livery conveyance . . . .

(b) to bodily injury or property damage caused intentionally by or at the direction of the insured;

(c) to bodily injury or property damage with respect to which an insured under this policy is also an insured under a nuclear energy liability policy . . . .

(d) to bodily injury or property damage arising out of the operation of a farm tractor or farm machinery;

(e) to bodily injury to any employee of the insured . . . .

(f) to bodily injury to any fellow employee of the insured injured in the course of his employment . . . .

(g) to an owned automobile while used by any person while such person is employed or otherwise engaged in the automobile business . . . .[5]

---

[5] In the Schiebout policy, twelve exclusions are listed:

EXCLUSIONS

This Policy Under Section Two Does Not Apply To:

1. Any automobile while used as a public or livery conveyance, but this exclusion does not apply to damages resulting from occupancy of a non-owned Automobile by the named Assured unless he is the operator thereof;

2. Bodily injury to any named Assured;

3. A non-owned Automobile while (a) used in the automobile business by the Assured, or (b) in any other business or occupation of the Assured except a private passenger automobile operated or occupied by the named Assured or his private chauffeur or domestic servant, or a trailer used therewith;

4. A non-owned Automobile (a) furnished for the regular use of the named Assured by the employer of such named Assured while being used in the business of such employer, or (b) rented to or leased by the named Assured or relative for a consecutive period of more than thirty days, or (c) unless the person using the Automobile has received permission of its owner;

5. An owned Automobile while used in the automobile business, but this exclusion shall not apply to the named Assured or a relative of the named Assured residing in the same household;

6. Bodily injury to any employee of the Assured arising out of and in the course of (a) domestic employment if benefits therefor are either payable or required to be provided under any workmen's compensation law or (b) any other employment by the Assured;

7. To any liability assumed by an Assured under any contract or agreement;

8. Bodily injury to any fellow employee of the Assured injured in the course of his employment if such injury arises out of the use of an automobile in the business of his employer, but this exclusion does not apply to the named Assured with respect to injury sustained by any such fellow employe;

9. Injury to or destruction of property owned by, rented to, in charge of, or transported by the Assured, except a residence or a private garage so rented;

10. Bodily injury or property damage arising out of the operation of farm machinery;

11. The United States of America or any of its agencies, or to any person, including the named Assured, with respect to bodily injury or property damage resulting from the operation of an automobile by such person as an employee of the United States Government while acting within the scope of his office or employment to the extent that the provisions of Section 2679 Title 28, United States Code (Federal Tort Claims Act) as amended, requires the Attorney General of the United States to defend such person in any civil action or proceeding which may be brought for such bodily injury or property damage.

12. Motor scooters or midget automobiles commonly referred to as "Karts," "Go-Karts," "Speed-mobiles," or any other similar name.

In the *Nicholson* case, the parties have not provided this Court with copies of the insurance policies at issue, and have not listed the exclusions in their briefs.

B. PERTINENT CASE LAW

We begin our consideration of the validity of the owned-vehicle exclusion by reviewing the pertinent case law of construction of insurance contracts.

In *Pietrantonio v Travelers Ins Co,* 282 Mich 111; 275 NW 786 (1937), the plaintiff was injured in an automobile in which he was riding as a passenger. The plaintiff, at the time of the accident, was considering purchasing the car, and its owner, who was not in the automobile business, was demonstrating the car to him. The owner's insurance policy with the defendant contained an exclusion for accidents occurring " 'while the automobile is used in the business of demonstrating or testing.' " *Id.* at 117. This Court held that, although the car was being demonstrated, it could not be said to have been used by its private owner in the "business of demonstrating." The Court stated:

> It is a principle of law too well established in this jurisdiction and others to need discussion or citation of authorities, that a policy of insurance couched in language chosen by the insurer must be given the construction of which it is susceptible most favorable to the insured; that technical constructions of policies of insurance are not favored; and that exceptions in an insurance policy to the general liability provided for are to be strictly construed against the insurer. *Pawlicki v Hollenbeck,* 250 Mich 38 [229 NW 626 (1930)]. [*Id.* at 116.]

In *Hooper v State Mutual Life Assurance Co,* 318 Mich 384, 388; 28 NW2d 331 (1947), this Court considered language in a double-indemnity clause of a life insurance policy that excluded payment under certain circumstances. The policy language stated:

"This provision shall not cover homicide or death resulting directly or indirectly from self-destruction or any attempt thereat while sane or insane; or the commission of assault or felony by the insured; combat, war or any act of war; participation in an insurrection, riot, or strike; travel, or flight in any aircraft or balloon, or from being in, on, or about any kind of aircraft or balloon; participation in submarine operations, or descent or riding in a submarine; from any physical or mental disease, illness, or infirmity; from sickness resulting from the eating of any form of food or drinking of any form of liquid; hemophilia; or bacterial infection other than that occurring in connection with, or in consequence of, accidental bodily injuries; or from any kind of poisoning, whether voluntary or otherwise, or asphyxiation; or from carbon monoxide or gas, or fumes, of any kind, voluntary or involuntary, accidental or otherwise, taken, administered, absorbed, or inhaled."

The insured was a victim of homicide. The plaintiff widow argued that the phrase "resulting directly or indirectly from" modified both "homicide" and "death," and since the insured's murder did not fit within one of the exceptions, the double-indemnity provision applied. The insurer claimed that the twelve exceptions pertained only to the word "death," and that *all* homicides were excluded from double-indemnity coverage. This Court noted that the insurance company would have the policy language read as though there were a comma or semicolon after the word "homicide," and held that, construing the provision in the light most favorable to the insured, the phrase "resulting directly or indirectly from" modified either the word "homicide" or the word "death" or both. This Court quoted *Boesky Bros Corp v USF & G Co,* 267 Mich 628, 629-630; 255 NW 307 (1934):

There is no question but that, in a case of ambiguity, the language must be strongly construed against the insurer. The courts have no patience with attempts by a paid insurer to escape liability by taking advantage of an ambiguity, a hidden meaning, or a forced construction of the language in a policy, when all question might have been avoided by a more generous or plainer use of words.

In *Francis v Scheper,* 326 Mich 441, 445; 40 NW2d 214 (1949), the plaintiff was injured in an automobile accident while being transported home from work by his employer. Under the plaintiff's employment agreement, he received an hourly wage and transportation to and from work. The garnishee defendant casualty company denied coverage because of a clause in the policy excluding coverage for an employee injured while "engaged in the employment of the insured." The Court found for the plaintiff, stating:

> The phrase, "engaged in the employment," can fairly be construed as meaning, active in the work plaintiff was employed and paid to do. It was incumbent on defendant casualty company, who drafted the policy, in order to escape liability under the circumstances of this case, so to draft the policy as to make clear the extent of nonliability under the exclusion clause. [*Id.* at 446-448.]

In *DeLand v Fidelity Health & Accident Mutual Ins Co,* 325 Mich 9; 37 NW2d 693 (1949), we considered a life insurance policy which contained a prominent notice indicating it was noncancellable. The policy also contained, in a section entitled "Additional Provisions," a sentence stating that the acceptance of renewal premiums was optional. Faced with the defendant insurer's claim that it was entitled to refuse to renew the policy, this Court stated:

In our judgment the much obscured sentence: "The acceptance of any renewal premium shall be optional with the company" is inconsistent with the much more prominently printed words of the policy heretofore noted and renders the policy not only ambiguous but deceptive. [*Id.* at 17.]

The *DeLand* Court also quoted *Schultz v Benefit Ass'n of Ry Employees of Chicago,* 175 SC 182, 187; 178 SE 867 (1934):

"[T]he policyholder must be protected against confusing statements in policies, and, wherever there are two constructions that can be placed upon the policy, the construction most favorable to the policyholder will be adopted." [*DeLand, supra* at 18.]

### C. SIX RULES DERIVED FROM CASE LAW

In construing the so-called owned-automobile exclusion, we are therefore guided by the following rules found in our case law:

1) "[E]xceptions in an insurance policy to the general liability provided for are to be strictly construed against the insurer." *Pietrantonio, supra* at 116.

2) An insurer may not "escape liability by taking advantage of an ambiguity . . . ." *Hooper, supra* at 393. " '[W]herever there are two constructions that can be placed upon the policy, the construction most favorable to the policyholder will be adopted.' " *DeLand, supra* at 18.

3) An insurer must "so . . . draft the policy as to make clear the extent of nonliability under the exclusion clause." *Francis, supra* at 448.

4) An insurer may not "escape liability by taking advantage of . . . a forced construction of the

language in a policy . . . ." *Hooper, supra.*
"[T]echnical constructions of policies of insurance are not favored . . . ." *Pietrantonio, supra.*

5) "The courts have no patience with attempts by a paid insurer to escape liability by taking advantage of an ambiguity, a hidden meaning, or a forced construction of the language in a policy, when all question might have been avoided by a more generous or plainer use of words." *Hooper, supra.*

6) "[N]ot only ambiguous but deceptive." "[T]he policyholder must be protected against confusing statements in policies . . . ." *DeLand, supra* at 17-18.

### D. APPLICATION OF RULES OF CASE LAW TO FACTS

Let us now apply these six rules of case law to the policies and facts in the instant cases.

### 1. Exclusions Construed Against Insurer

At the outset and overall, as held in *Pietrantonio,* "exceptions in an insurance policy to general liability provided for are to be strictly construed against the insurer." The issue in these cases involves the owned-automobile exclusion. As a consequence, the owned-automobile exclusion must "be strictly construed against the insurer."

### 2. Ambiguities Construed in Favor of Insured

*Hooper* held an insurer may not "escape liability by taking advantage of an ambiguity." This rule raises the question most vigorously argued by the parties in the instant cases, i.e., was there an ambiguity so that the policy must be construed in favor of the claimant?

Instant claimants contend that in the plain English of the policy, the accident, they as persons,

and the automobiles they drove were covered. Insurers contend the automobiles driven were not covered.

Having in mind the policy as set out *ante,* pp 617-618 except as hereinafter stated, let us review whether or not there was an ambiguity. We first look to see whether the injury is of the type covered. The excerpt "Coverage A—Bodily Injury Liability," *ante,* pp 617-618 covers the injuries in question without doubt.

We next look to see who is insured. Since this is the principal issue here, we reproduce the pertinent text quoted *ante,* p 617:

> Persons Insured: The following are insureds under Part I:
> (a) with respect to the owned automobile,
> (1) the named insured and any resident of the same household,
>
> * * *
>
> (b) with respect to a non-owned automobile,
> (1) the named insured,
> (2) any relative . . . .

Reading "Persons Insured" leads to the clear conclusion the claimants here are provided liability coverage. The claimants are either the named policyholder or resident relatives of the policyholder, so with respect to both categories—"owned automobile" and "nonowned automobile"—they are covered. Since the terms "owned automobile" and "nonowned automobile" are terms in common use with unambiguous meanings, claimants argue that there is no reason to look any further.

Moreover, claimants contend that if a "supercautious" policy reader wanted to make certain there was no pertinent exclusion from coverage, the reader could look at the section on exclusions.

Examination of that section would reveal no exclusion that is pertinent to the facts in question.

So examination of accident coverage, persons insured and exclusions, claimants contend, indicates that there should be entitlement to liability coverage.

The insurers contend that there is indeed an exclusion from coverage. They say that there is a third category of automobiles in addition to owned automobiles and nonowned automobiles.

The insurers explain this paradox by saying that when their policies use the common term "nonowned automobile," it has a special meaning for purposes of the policies that requires a policyholder to look beyond the clear and common understanding of the term to the policies' definitions section. There nonowned automobile is defined as follows:

> "[N]on-owned automobile" means an automobile or trailer not owned by or furnished for the regular use of either the named insured or any relative . . . .

One must also consult the definition of "relative" to see that it means a relative "who is a resident of the same household" as the named insured.

The pieces, as contended by the insurer, are all there and can be put together, if you are an expert specially experienced in these matters.

The question to be decided remains. Are there two constructions, so that the insured's construction must prevail? It would fairly appear that there is here a real ambiguity, and consequently the claimants' construction should prevail.

In any event, it is instructive to refer to the policy in the *Hooper* case, which contained this exclusion: "This provision shall not cover homicide

or death resulting directly or indirectly
from . . . ," followed by twelve specified modifiers
as set out *ante*, p 621. The ambiguity in that
case concerned whether the modifiers applied to
both "homicide" and "death" or just to the latter.
The modifiers included some conditions which
would appear to have reference only to "death"
and not to "homicide," for example: "resulting
directly or indirectly from . . . travel, or flight in
any aircraft or balloon"; "participation in subma-
rine operations"; and "hemophilia." It certainly
was arguable by the insurer, as in the instant
cases, that the nature of the modifiers made only
the insurer's construction reasonable, i.e., the mod-
ifiers applied only to "death" but not to "homi-
cide." However, this Court held oppositely and
denied the exclusion. The instant cases certainly
present greater ambiguity than in *Hooper.* There-
fore, it is reasonable for this Court to invalidate
the owned-automobile exclusion in these cases.

### 3. Policy Must "Make Clear" the Exclusion

*Francis, supra* at 447-448, held that "[i]t was
incumbent on defendant casualty company . . . so
to draft the policy as to make clear the extent of
nonliability under the exclusion clause." The im-
plication of this rule is not only that ambiguities
are to be construed against the insurer, but that
the insurer has a positive and affirmative duty to
"make clear" any exclusion. The question in *Fran-
cis* was whether an automobile injury to an em-
ployee being driven home according to agreement
was compensable under an exclusion while "en-
gaged in the employment of the insured." The
insurer, of course, argued that the employee was
"engaged in the employment of the insured,"
whereas the plaintiff employee argued he was not

"engaged in employment." This Court held for the employee and indicated that if the insurer didn't mean "active in the work plaintiff was employed and paid to do" it was up to the insurer to draft the provision to "make clear" what it wanted to say.

Applying this rule to the instant cases, we discover that there was no reference at all to the so-called owned-automobile exclusion in the exclusions section. Consequently, the insurers are in violation of this rule and the exclusion is invalid unless it can be said that the definition of "non-owned automobile" was not a definition clause but an exclusion clause. If the definition were considered as an exclusion clause, it certainly wouldn't seem to have been made clear as *Francis* would require.

### 4. Liability Not Escaped Through Forced or Technical Construction

Rule 4 is that an insurer may not "escape liability [through] . . . forced construction of the language in a policy" (*Hooper*) or "[t]echnical constructions" (*Pietrantonio*). The construction of the owned-automobile exclusion is certainly a technical one, requiring the application of an obscurely drafted definition to an apparently unambiguous meaning of a commonly used English word.

In *Hooper*, the "forced construction" was merely whether the adjacent modifying terms applied to only "death" or both "homicide or death" in the phrase "shall not cover homicide or death resulting directly or indirectly from self-destruction" etc. In *Pietrantonio*, the technical phrase was " 'while the automobile is used in the business of demonstrating or testing.' " Clearly the owned-automobile exclusion is much more forced and technical

than either of these and the insurers should not escape liability.

## 5. Plainer or More Generous Use of Words

Rule 5 states "[t]he courts have no patience with attempts by a paid insurer to escape liability by taking advantage of an ambiguity, a hidden meaning, or a forced construction of the language in a policy, *when all question might have been avoided by a more generous or plainer use of words.*" (Emphasis added.) *Hooper, supra* at 393. Not to say there are not plainer and better ways of drafting the so-called owned-automobile exclusion, but the few suggested italicized words inserted below in the text of the instant insurers' policies would go a long way toward putting the policy buyers and those dependent on the policy on notice:

> Persons Insured: The following are insureds under Part I:
> (a) with respect to the owned automobile [*as defined in the Definitions Section*]
> (1) the named insured and any resident of the same household,
>
>         *   *   *
>
> (b) with respect to a non-owned automobile [*as defined in the Definitions Section*]
> (1) the named insured,
> (2) any relative . . . .

The failure of the drafters to be at least this open in their drafting demonstrates a clear disregard of Rule 5. In addition, clarity would seem to require that the owned-automobile exclusion should appear in the exclusions section in some form. In any particular policy these suggestions could prove insufficient and it would be necessary

to judge their substance and form to see whether they make clear the exclusion.

At this point it is informative, as noted by Justice Levin in his concurring opinion in *Ruuska,* to compare the lack of notice regarding the owned-vehicle exclusion with the notice required by the no-fault statute when a named person is excluded from liability coverage. The exclusion must be expressly "authorized by the insured," and the following notice must appear, both on the face of the policy, the declaration page, or the certificate of the policy *and* on the required certificate of insurance carried by Michigan drivers:

> "Warning—when a named excluded person operates a vehicle all liability coverage is void—no one is insured. Owners of the vehicle and others legally responsible for the acts of the named excluded person remain fully personally liable." MCL 500.3009; MSA 24.13009.[6]

### 6. The Policyholder Protected Against Confusing Statements

Rule 6 originates from the *DeLand* case, which held that the insurance policy may not prominently make a promise of coverage and then less prominently attempt to contradict that promise in whole or in part in the body of the policy. *DeLand* found that doing so was "not only ambiguous but deceptive."

In *DeLand* there was a prominent notice indicating a life insurance policy was noncancellable, but, in a later section entitled "Additional Provisions," there was included a sentence stating that the acceptance of renewal premiums was optional.

---

6 See *Ruuska, supra* at 349, n 20.

This Court held the later clause invalid because it rendered the policy deceptive.

In the instant policies there is a promise of coverage in case of injury caused by an insured while driving an owned or nonowned automobile. In plain English this seems to cover everything. Later on in the definitions section in a complex sentence there is a limitation on the meaning of "nonowned" which limits the coverage afforded. In short, the *DeLand* Rule 6 seems to apply to the owned-automobile exclusion and render it invalid because it is deceptive and confusing.

### SUBCONCLUSION

The owned-automobile exclusion appears to implicate all of the above six rules of construction gleaned from Michigan case law. The combined effect of these rules clearly invalidates the instant owned-automobile exclusions, and several of the individual rules as well would invalidate the instant owned-automobile exclusions.

### E. THE RULE OF REASONABLE EXPECTATIONS

An adjunct to the rules of construction of insurance contracts is the rule of reasonable expectations.[7]

The rule was stated in *Zurich Ins Co v Rombough,* 384 Mich 228, 232-233; 180 NW2d 775 (1970), in which we quoted Justice Tobriner in the California case of *Gray v Zurich Ins Co,* 65 Cal 2d 263, 269-270; 54 Cal Rptr 104; 419 P2d 168 (1966), as follows:

---

[7] Our understanding of reasonable expectations does not require an ambiguity as a prerequisite to the application of the doctrine.

In interpreting an insurance policy we apply the general principle that doubts as to meaning must be resolved against the insurer and that any exception to the performance of the basic underlying obligation must be so stated as clearly to apprise the insured of its effect.

These principles of interpretation of insurance contracts have found new and vivid restatement in the doctrine of the adhesion contract. As this court has held, a contract entered into between two parties of unequal bargaining strength, expressed in the language of a standardized contract, written by the more powerful bargainer to meet its own needs, and offered to the weaker party on a "take it or leave it" basis carries some consequences that extend beyond orthodox implications. Obligations arising from such a contract inure not alone from the consensual transaction but from the relationship of the parties.

Although courts have long followed the basic precept that they would look to the words of the contract to find the meaning which the parties expected from them, they have also applied the doctrine of the adhesion contract to insurance policies, holding that in view of the disparate bargaining status of the parties we must ascertain that meaning of the contract which the insured would reasonably expect.

It is our opinion today that, in these cases, the policyholder, *upon reading the contract language*[8] is led to a reasonable expectation of coverage.

The word "nonowned" is commonly understood to mean any car not owned by the subject. The

---

[8] When considering this doctrine, it is important to understand reasonable expectations under what circumstances. As indicated in the text, this opinion considers reasonable expectations with respect to the *reader* of the policy. A person not reading the policy might not expect to be covered when driving a nonowned car, because the owner was buying insurance for the owned car only. However, once the coverage of owned and nonowned automobiles is read, the policy purchaser's reasonable expectations would be for coverage. *Raska v Farm Bureau Mutual Ins Co,* 412 Mich 355, 362-363; 314 NW2d 440 (1982).

result of the difference between the common definition and the policy definition is that, while in common usage, every existing car is either owned or nonowned, in the policy language there is a significant group of cars that is neither owned nor nonowned. Rather than there being an affirmative statement of exclusion, there is an omission, contrary to the common interpretation of the broad statement of coverage of "the owned automobile or any nonowned automobile"[9] To discover the omission, a person must refer to a separate section. Inasmuch as the excluded cars, i.e., cars owned by family members residing in the same household as the policyholder, are the ones most likely to be occasionally driven by the other insured family members, the owned-vehicle exclusion is the most significant exclusion in the liability coverage of the policies. If a policyholder refers to the section entitled "Exclusions," a long list of exceptions to coverage will be discovered, but not a single word regarding the exclusion most likely to be invoked.

We believe that insured persons *reading the liability provisions* of these policies would reasonably expect liability coverage when driving the automobile insured by the policy and when driving other cars not owned by the insured. If the insurer intends to exclude such coverage when the insured person drives certain cars, it is simple enough to say so. As stated by Judge Learned Hand in *Gaunt v John Hancock Mutual Life Ins Co,* 160 F2d 599, 602 (CA 2, 1947), cert den 331 US 849 (1947):

> [I]nsurers who seek to impose upon words of common speech an esoteric significance intelligible

---

[9] In the Schiebout policy, coverage is afforded for injury "arising out of the ownership, maintenance or use . . . of the owned automobile or a non-owned automobile . . . ." We do not find the difference between the use of "a" and "any" to be significant.

only to their craft, must bear the burden of any resulting confusion.

For all of the foregoing reasons, we would hold that an insurer may not, by artful definition of terms at variance with their commonly understood meanings, and by failure to speak plainly and clearly, effect an exclusion of coverage in an automobile liability policy.

F. THE QUESTION OF "STACKING"

In *Deyarmond* and *Nicholson*, the claimants are attempting to enlarge their residual liability coverage by "stacking"—obtaining coverage from more than one potentially applicable policy for the same accident. The insurers are attempting to employ the owned-vehicle exclusion as an antistacking clause, to prevent the aggregation of coverage.

Decisions regarding the validity of antistacking clauses in this state have varied as automobile insurance law has changed. In *Horr v DAIIE,* 379 Mich 562; 153 NW2d 655 (1967), this Court enforced an "other insurance" clause preventing stacking of two policies of uninsured motorist coverage. In *Blakeslee v Farm Bureau Mutual Ins Co,* 388 Mich 464; 201 NW2d 786 (1972), and *Boettner v State Farm Mutual Ins Co,* 388 Mich 482; 201 NW2d 795 (1972), this Court invalidated other-insurance clauses and owned-vehicle exclusions as antistacking devices for uninsured motorist coverage. These latter decisions were based on MCL 500.3010; MSA 24.13010, which required that uninsured motorist coverage be offered to all insureds covered for liability. That statute was effec-

tive January 1, 1966, and was not at issue in *Horr.* In 1973, the no-fault statute was enacted and § 3010 was repealed. Subsequently, in *Bradley v Mid-Century Ins Co,* 409 Mich 1, 48; 294 NW2d 141 (1980), this Court stated that other-insurance clauses in uninsured motorist coverage are enforceable and benefits under such policies may not be stacked.

In reaching that conclusion, the *Bradley* Court stated that prevention of stacking of such coverage does not defeat an insured's reasonable expectations. *Id.* at 57-59.

Assuming that antistacking clauses are similarly valid with regard to residual liability coverage, we note that the insurers in the cases we consider today do not claim that their policies contain other-insurance clauses, but instead rely on the owned-vehicle exclusion to prevent stacking in cases in which an insured is driving an automobile owned by a resident relative.[10]

Having held that the owned-vehicle exclusion employed in those policies is fatally ambiguous and invalid under the Michigan case law for construing insurance exclusions, we perceive no rationale which would lead us to conclude that the exclusion should nonetheless be held to be enforceable to the extent that it prevents stacking. Whether or not, before reading the policy, a policyholder had a reasonable expectation of the ability to stack coverage, upon reading the policies at issue in these cases, coverage would be expected.[11]

### G. THE QUESTION OF THE EXCLUSION WITH REGARD TO UNINSURED MOTORIST COVERAGE.

*FACTS: POWERS v DETROIT AUTOMOBILE INTER-INSURANCE EXCHANGE*

---

[10] The policies apparently allow stacking in cases in which a family member incurs liability while driving a nonhousehold car.

[11] See n 8.

On February 16, 1980, the plaintiff, Wanda Powers, was seriously injured while she was a passenger in an automobile owned by her sister, Donna Powers. Donna had been driving the car until it became disabled. She had then parked it on the shoulder of the road and had gone for help, leaving Wanda seated in the car. A van struck the parked automobile from the rear, throwing Wanda out of the car.

Neither the van's owner nor its driver was insured. Donna Powers had not insured her automobile, and Wanda Powers had no insurance of her own.

The Powers sisters lived with their mother, Louise, who owned an automobile and had purchased a no-fault policy with the defendant, Detroit Automobile Inter-Insurance Exchange. The policy had optional uninsured motorist coverage for which Louise Powers had paid an extra premium. By the terms of the policy, Wanda was insured as a relative living in the same household as her mother.

The defendant paid personal protection insurance benefits, but denied payment of uninsured motorist benefits, due to the policy's owned-automobile exclusion. Wanda Powers filed suit in Wayne Circuit Court and was granted summary judgment against defendant DAIIE. The Court of Appeals affirmed. This Court granted leave to appeal, 422 Mich 974 (1985).

### DISCUSSION

The *Powers* case presents the issue of the validity of the owned-vehicle exclusion in a somewhat different context. In this case, the insurer is attempting to apply the exclusion to optional uninsured motorist coverage. The parties do not raise

the threshold issue of the validity, under the no-fault statute, of an exclusion of uninsured motorist coverage, and our analysis does not require us to reach that issue.[12]

The definitions of "owned automobile" and "non-owned automobile" in the Powers policy are the same in all significant respects as those in the Deyarmond policy quoted earlier. The definitions themselves were not contained in the uninsured motorist endorsement, but the following statement was contained in the definitions section of the endorsement:

> "(b) the definitions of 'owned automobile' and 'non-owned automobile' in Section I [of the principal policy] apply to Uninsured Motorists coverage . . . ."

The Powers endorsement, however, did contain an "Exclusions" section which stated in pertinent part:

> "The insurance afforded by this coverage does not apply:

---

[12] Although the insurer in this case argues that

"Plaintiff's current coverage predicament arises from the fact that the Powers household was engaged in the disfavored practice of owning and operating an uninsured automobile," the true posture of the case is such that if Donna Powers had purchased the required basic no-fault coverage on her car, it would not have made any difference in the parties' positions. It is only Donna's failure to purchase *optional* uninsured motorist coverage that puts the parties in their present positions. Louise Powers' uninsured motorist coverage is a substitute for the unavailable residual liability coverage of the owner and driver of the uninsured van that struck Donna's parked car, injuring Wanda. Unlike the cases involving residual liability coverage, this is not a case of *Donna's* liability being transferred to her mother's policy because of her own lack of insurance, but of the liability of the owner and driver of the van being assumed by Louise Powers' policy, which is the usual case with uninsured motorist coverage. If Wanda had been a pedestrian, or sitting on the curb, she would have been covered by her mother's policy. The connection between the accident and the fact that Wanda was occupying the (parked) household car is therefore more attenuated.

"(1) to bodily injury to an insured sustained while occupying any automobile, other than an owned automobile, except a non-owned automobile to which there is applicable and available to such insured no insurance similar to that afforded by this coverage."

Although, unlike the residual liability cases, the endorsement here does contain the above language in the exclusion section, the wording of the exclusion poses for the reader essentially the same problem as the statement of coverage poses in the residual liability cases. A policyholder would not expect that the terms owned and nonowned have contractual definitions at variance with their common meanings. Therefore, reading the exclusion and employing the common meanings, the policyholder would understand the exclusion to apply to automobiles not owned by the insured *that are covered by a policy that includes uninsured motorist coverage.* By that interpretation the exclusion would operate as an antistacking clause. Wanda Powers' injuries would not be excluded, because of the exception for injuries occurring while the insured is occupying "a non-owned automobile to which there is applicable and available . . . no insurance similar to that afforded by this coverage," and the car in which Wanda Powers was injured did not carry uninsured motorist coverage.

Therefore, under the rules of construction we derived from the Michigan case law, we would conclude that the insurer's claimed exclusion was invalid, because of the technical definition of the term "nonowned." We recognize that subsection (b) of the definitions section of the endorsement quoted above states that "the definitions of 'owned automobile' and 'nonowned automobile' in Section I [of the main policy] apply to Uninsured Motorist Coverage." However, we do not believe this refer-

ence clarifies in the endorsement that which was not clear in the main policy. It does point out, however, that the drafters were not unacquainted with the reference device. How easy it would have been, and how much more significant and helpful, had the drafters referenced the definitions section and the definition of "nonowned automobile" in the PERSONS INSURED section as discussed in part VI. It is there that the insured is led to believe that the insured is covered because that section says the insured is covered in both an owned and a nonowned automobile. If that section had specified a nonowned automobile (as defined in the definitions section), then the insurer would have had a better argument to sustain his technical construction.

In conclusion then, despite the differences in facts, the *Powers* case may be resolved under the analysis used in the residual liability cases discussed above, and we would hold, for the same reasons, that the nonowned-vehicle exclusion is void because it is unclear, ambiguous, and contrary to the policyholders' reasonable expectations.

## VII. ISSUE III: IF THE OWNED-AUTOMOBILE EXCLUSION IS VOID, IS THE STATUTORY MINIMUM OR THE CONTRACTUAL LIABILITY COVERAGE IN EFFECT?

The issue raised in *Dennison* and also in *Nicholson* is whether the statutory minimum liability coverage or the higher contractual liability coverage obtains, where liability occurs because an attempted exclusion from liability, the owned-automobile exclusion, is held invalid as not clear and properly drafted.

### A. FACTS: *DENNISON v WISNIEWSKI*

On September 11, 1980, plaintiff, Robert Denni-

son, was injured when the motorcycle on which he
was a passenger was struck by an automobile
driven by Myron Wisniewski and owned by My-
ron's father, Mitchell Wisniewski. Dennison filed
suit against the Wisniewskis, seeking damages for
his injuries. Mitchell carried a policy with the
Auto Club insuring the car involved in the acci-
dent, which provided for residual liability coverage
of $20,000 per person and $40,000 per incident.
Myron had a policy on another vehicle which he
owned, which provided for residual liability cover-
age of $50,000 per person and $100,000 per inci-
dent. Both policies had owned-automobile exclu-
sions. The insurer and insured parties, relying on
the result in *State Farm v Ruuska,* 412 Mich 321;
314 NW2d 184 (1982), agreed that the policies
were both applicable and could therefore be
stacked. The injured plaintiff filed a garnishment
action to determine the amount of coverage. Plain-
tiff argued that the policy limit of $50,000 was
payable from Myron Wisniewski's policy. Gar-
nishee defendant Auto Club claimed that, because
"the coverage that was being afforded . . . was by
*operation of law* (i.e., *Ruuska's* invalidation of the
exclusionary clause) and contrary to the express
terms of the contract, no more coverage was af-
forded than the minimum liability" coverage re-
quired by law. The trial court granted summary
judgment for Auto Club. In an unpublished opin-
ion, the Court of Appeals reversed. We granted
leave to appeal, 424 Mich 879 (1986).

### B. ANALYSIS

In these cases, the insurers argue that the appli-
cable limit of the liability policies at issue should
be the minimum coverage of $20,000 per person
and $40,000 per incident required by law, MCL

500.3131; MSA 24.13131, MCL 500.3009; MSA 24.13009, rather than the $50,000/$100,000 limits of coverage contained in the policies. The argument is based on our opinion in *State Farm Mutual Automobile Ins Co v Shelly,* 394 Mich 448; 231 NW2d 641 (1975), in which we held that, where an exclusionary clause in an automobile liability insurance policy was held to be void under the Motor Vehicle Accident Claims Act (MVACA), the reinstated coverage would be the minimum required by law rather than the amount stated in the policy.

The claimant argues that the removal of one invalid clause (the owned-vehicle exclusion) from the policy should not cause the reformation of another, unrelated, clause. Claimant also argues that the application of *Shelly* to this situation would defeat the policyholder's reasonable expectations, and that the *Shelly* doctrine should be abandoned.

In *Shelly,* an automobile liability policy expressly excluded coverage of the insured vehicle when the family's son was driving. The son drove the car, resulting in death and serious injury to several persons. That exclusion was held to be void as against the policy of the MVACA. Therefore, *Shelly* may be cited for the proposition that where a clearly expressed exclusion is found to be invalid under a controlling statute, the reinstated coverage shall be the minimum required by law. Such is not the case here.

In *Dennison,* and in *Nicholson* as well, the owned-automobile exclusion is invalidated, not because the no-fault act requires its invalidation, but because the insurer did not draft the exclusion in a clear and understandable fashion. As set forth in ISSUE I (PART V) of this opinion, the no-fault act

permits this type of exclusion. This result is also authorized in *Ruuska* by the combination of Justice Coleman's three-vote opinion and Justice Levin's one-vote opinion. The owned-automobile exclusion in *Dennison* and *Nicholson* is invalidated by its improper drafting as set forth in issue ii (part vi) of this opinion.

The rationale of the *Shelly* opinion is that, where a clearly worded exclusion in an insurance contract is void as contrary to the statutory policy, the statute controls both as to the exclusion and the amount of liability coverage. Since the rationale of the invalidation of the exclusion in the instant cases is improper drafting, the insurance contract is reformed only to the extent of the impropriety which affects the exclusion, but not the liability coverage. The result, therefore, is that in *Dennison* and *Nicholson,* the liability coverage is that contracted and paid for, rather than the statutory minimum.

### CONCLUSION

We would hold today that a no-fault insurer may exclude coverage for residual liability when an insured is driving a vehicle owned by a resident family member, so long as the exclusion is clearly and unambiguously stated. In *Schiebout, Deyarmond,* and *Nicholson,* the exclusion was not clearly stated and is therefore void. In *Powers,* a similar exclusion in optional uninsured motorist coverage is void for the same reason. In *Dennison,* the applicable limit of residual liability coverage is the $50,000 provided by the policy.

We would affirm the decisions of the Court of Appeals in *Powers, Schiebout,* and *Dennison,* and reverse the decisions in *Deyarmond* and *Nicholson.*

Archer, J., concurred with Williams, C.J.

BRICKLEY and CAVANAGH, JJ., concurred in the result only.

RILEY, J. (*concurring in part and dissenting in part*). I respectfully dissent from the opinion of my colleagues in *Powers, Deyarmond, Nicholson,* and *Schiebout* for the reasons set forth by former Chief Justice COLEMAN in her opinion in *State Farm v Ruuska,* 412 Mich 321, 353; 314 NW2d 184 (1982). I would hold that the nonowned automobile exclusion is enforceable.

Thus, I would reverse the decisions of the Court of Appeals in *Powers* and *Schiebout,* and affirm the decisions of the Court of Appeals in *Deyarmond* and *Nicholson.*

Finally, I am in accord with the result reached by my colleagues in *Dennison.*

BOYLE, J., concurred with RILEY, J.

LEVIN, J. (*concurring in part and dissenting in part*). In these cases consolidated on appeal the principal question is the validity of the exception from nonowned automobile liability and uninsured motorist coverage when the person otherwise insured is driving or occupying a vehicle owned by a relative or a relative residing in the same household. I would hold that the so-called household exception is not invalid per se, but may be invalid as sought to be applied in particular cases.

In *Powers v DAIIE,* the household exception is invalid as the insurer would apply it.

In *Deyarmond v Community Service Ins Co,* Ester Deyarmond, rather than her son Steven, is the plaintiff. The exception is not invalid as applied to her.

In *Auto Club Ins Ass'n v Nicholson,* the exception is invalid as the insurer would apply it, but the insurer should be subject to liability for

at most[1] one additional and not two additional $25,000/$50,000 coverages.

In *Schiebout v Citizens Ins Co,* I would remand for further factfinding and, because the majority does not reach the question, express no opinion on the question reserved in *DAIIE v Widling,* 420 Mich 549; 362 NW2d 227 (1984).

In *Dennison v Wisniewski,* where the facts parallel those in *State Farm Mutual Automobile Ins Co v Ruuska,* 412 Mich 321; 314 NW2d 184 (1982), the exception is invalid as applied.

I

The facts in *Dennison* parallel those in *State Farm v Ruuska, supra,* where this Court considered the validity of the exclusion from residual liability coverage when the policyholder was driving a vehicle owned by a relative residing in the same household. Three justices, in an opinion by Chief Justice WILLIAMS, were of the opinion that the clause was violative of the no-fault automobile liability act. I did not agree and wrote:

> An insurer is not required by the no-fault act to provide portable coverage when the owner drives another insured vehicle.[2]

As set forth in the *Ruuska* syllabus, I agreed

---

[1] Subject to the possible applicability of the "other insurance" clause. See part IV, last two paragraphs.

[2] In a footnote I said:

> Other provisions and policies of the act are implicated where a person insured or covered by a no-fault policy drives an uninsured vehicle. No opinion is intimated in that regard. [*Id.,* 343, n 8.]

The issue suggested in the footnote arises in *Schiebout,* and is adverted to in part V of this opinion.

with their conclusion and said that "the exclusion in this case is unenforceable because it is unconscionable and contrary to the reasonable expectations of an insured where the insured, driving an automobile not owned or leased by him, has not been offered and has [not] declined to purchase a rider deleting the exclusion or a specific exception from the exclusion or coverage for 'frequent,' 'regular,' or other atypical use of nonowned automobiles."

In *Ruuska,* Gloria Carlson owned an automobile with residual liability coverage of $25,000 per person, $50,000 per accident. Her father, in whose household she was living, owned an automobile covered by a separate insurance policy providing at least the coverage ($20,000 per person/$40,000 per accident) required by the no-fault act.

The accident occurred while Gloria Carlson was driving her father's automobile. Her own automobile was not involved. Since the liability arising from the accident might have exceeded the coverage limits of her father's policy, the question was whether Gloria Carlson's policy was also applicable. State Farm, the insurer, said that liability was excluded by the insurance policy definition of a nonowned automobile as meaning an automobile " 'not owned by, registered in the name of, or furnished or available for the frequent or regular use of the named insured, his spouse, or any relative of either residing in the same household, other than a temporary substitute automobile.' " *Id.,* 332.

Robert Dennison was a passenger on a motorcycle owned by Mitchell Wisniewski that was being operated by his son Myron Wisniewski. As in *Ruuska,* the child, who was driving the parent's vehicle at the time of the accident, owned an automobile which he had insured for more than

the statutory minimum. Myron had purchased policy limits of $50,000 per person/$100,000 per accident. The father, Mitchell, had purchased policy limits of $20,000/$40,000.

The exclusion from coverage in *Dennison* tracks closely the exclusion in *Ruuska:* a nonowned automobile is defined as meaning "any automobile or trailer, other than a temporary substitute automobile, not owned by, furnished or available for the frequent or regular use of the named insured, relative or other resident of the same household of such named insured . . . ."

For the reasons stated in *Ruuska,* I would hold that the exclusion in *Dennison* is not enforceable.

A policy of automobile insurance is not an ordinary contract. It is the classic contract of adhesion. As is apparent from the five cases being considered in this consolidated appeal and from the other cases we have seen over the years, the so-called household exception (or a variant that includes relatives not residing in the household)[3] to the portability of residual liability and uninsured motorist coverage is generally written into all policies issued by all insurers. The household exception is imposed on all persons who purchase automobile insurance. There is no negotiation and no opportunity to purchase a waiver of the household exception.

There was a time when a manufacturer could

---

[3] As noted in a footnote in *State Farm v Ruuska, supra,* the policy in the companion case of *Raska v Farm Bureau Mutual Ins Co,* 412 Mich 355; 314 NW2d 440 (1982), written by Farm Bureau, did not limit the exception to a relative residing in the same household. By its terms, the Farm Bureau exception applied if one were to borrow, perhaps for the first time, an automobile belonging to a cousin or in-law. It would apply if the cousin or in-law's automobile was parked on the driveway behind one's own automobile, and the accident occurred when the only driving was moving the cousin or in-law's automobile out of the driveway onto the street so as to gain access to one's own automobile.

exclude implied warranties. In *Henningsen v Bloomfield Motors, Inc,* 32 NJ 358; 161 A2d 69 (1960), the Supreme Court of New Jersey held both the manufacturer of an automobile and the dealer who sold it to the purchaser's wife, who was driving the automobile, were subject to liability on an implied warranty. The court held invalid the attempted contractual limitation on the manufacturer's warranties noting that all three major manufacturers of automobiles had contracted against the implied warranty of merchantability that otherwise would attach as an incident of a sale of an automobile. Today the rule is very clear that the manufacturer of a product cannot contract against its liability for a defect in the product.

An automobile insurance policy is a product manufactured by the insurance industry.[4] It is

---

[4] The analysis in *Henningsen* applies to the automobile insurance industry as well as to the automobile manufacturing industry:

> In the modern consideration of problems such as this, Corbin suggests that practically all judges are "chancellors" and cannot fail to be influenced by any equitable doctrines that are available. And he opines that "there is sufficient flexibility in the concepts of fraud, duress, misrepresentation and undue influence, not to mention differences in economic bargaining power" to enable the courts to avoid enforcement of unconscionable provisions in long printed standardized contracts. 1 Corbin on Contracts (1950) § 128, p 188. Freedom of contract is not such an immutable doctrine as to admit of no qualification in the area in which we are concerned. As Chief Justice Hughes said in his dissent in *Morehead v People of State of New York ex rel Tipaldo,* 298 US 587, 627; 56 S Ct 918; 80 L Ed 1347, 1364 (1936):
> "We have had frequent occasion to consider the limitations on liberty of contract. While it is highly important to preserve that liberty from arbitrary and capricious interference, it is also necessary to prevent its abuse, as otherwise it could be used to override all public interests and thus in the end destroy the very freedom of opportunity which it is designed to safeguard."
> That sentiment was echoed by Justice Frankfurter in his dissent in *United States v Bethlehem Steel Corp,* 315 US 289, 326; 62 S Ct 581; 86 L Ed 855, 876 (1942):

"It is said that familiar principles would be outraged if
Bethlehem were denied recovery on these contracts. But is
there any principle which is more familiar or more firmly
embedded in the history of Anglo-American law than the basic
doctrine that the courts will not permit themselves to be used
as instruments of inequity and injustice? Does any principle in
our law have more universal application than the doctrine that
courts will not enforce transactions in which the relative
positions of the parties are such that one has unconscionably
taken advantage of the necessities of the other?

"These principles are not foreign to the law of contracts.
Fraud and physical duress are not the only grounds upon
which courts refuse to enforce contracts. The law is not so
primitive that it sanctions every injustice except brute force
and downright fraud. More specifically, the courts generally
refuse to lend themselves to the enforcement of a 'bargain' in
which one party has unjustly taken advantage of the economic
necessities of the other. . . ."

The traditional contract is the result of free bargaining of
parties who are brought together by the play of the market,
and who meet each other on a footing of approximate economic
equality. In such a society there is no danger that freedom of
contract will be a threat to the social order as a whole. But in
present-day commercial life the standardized mass contract has
appeared. It is used primarily by enterprises with strong bar-
gaining power and position. "The weaker party, in need of the
goods or services, is frequently not in a position to shop around
for better terms, either because the author of the standard
contract has a monopoly (natural or artificial) or because all
competitors use the same clauses. His contractual intention is
but a subjection more or less voluntary to terms dictated by the
stronger party, terms whose consequences are often understood
in a vague way, if at all." Kessler, *Contracts of Adhesion—
Some Thoughts About Freedom of Contract*, 43 Colum L Rev
629, 632 (1943); Ehrenzweig, *Adhesion Contracts in the Conflict
of Laws*, 53 Colum L Rev 1072, 1075, 1089 (1953). Such stan-
dardized contracts have been described as those in which one
predominant party will dictate its law to an undetermined
multiple rather than to an individual. They are said to resem-
ble a law rather than a meeting of the minds. *Siegelman v
Cunard White Star*, 221 F2d 189, 206 (CA 2, 1955).

* * *

The warranty before us is a standardized form designed for
mass use. It is imposed upon the automobile consumer. He
takes it or leaves it, and he must take it to buy an automobile.
No bargaining is engaged in with respect to it. In fact, the
dealer through whom it comes to the buyer is without author-
ity to alter it; his function is ministerial—simply to deliver it.
The form warranty is not only standard with Chrysler but, as
mentioned above, it is the uniform warranty of the Automobile
Manufacturers Association. Members of the Association are:

purchased—like an automobile, washing machine, or a toaster—by a consumer who has a right to expect that it will not be defective. The courts have defined what constitutes a defect for manufactured products. It is, I believe, incumbent on the courts (see n 4) to determine when a policy of insurance is defective because it does not do the job that the consumer reasonably expects it to do.

Liability coverage for the insured, spouse, and relatives residing in the household while driving a nonowned automobile has now become standard in automobile liability policies. The issue whether the household exception as written is conscionable should be viewed in that context.

Gloria Carlson and Myron Wisniewski pur-

General Motors, Inc., Ford, Chrysler, Studebaker-Packard, American Motors (Rambler), Willys Motors, Checker Motors Corp., and International Harvester Company. *Automobile Facts and Figures* (1958 Ed., Automobile Manufacturers Association) 69. Of these companies, the "Big Three" (General Motors, Ford, and Chrysler) represented 93.5% of the passenger-car production for 1958 and the independents 6.5%. *Standard & Poor* (Industrial Surveys, Autos, Basic Analysis, June 25, 1959) 4109. And for the same year the "Big Three" had 86.72% of the total passenger vehicle registrations. *Automotive News,* 1959 *Almanac* (Slocum Publishing Co, Inc) p 25.

The gross inequality of bargaining position occupied by the consumer in the automobile industry is thus apparent. There is no competition among the car makers in the area of the express warranty. Where can the buyer go to negotiate for better protection? Such control and limitation of his remedies are inimical to the public welfare and, at the very least, call for great care by the courts to avoid injustice through application of strict common-law principles of freedom on contract. Because there is no competition among the motor vehicle manufacturers with respect to the scope of protection guaranteed to the buyer, there is no incentive on their part to stimulate good will in that field of public relations. Thus, there is lacking a factor existing in more competitive fields, one which tends to guarantee the safe construction of the article sold. Since all competitors operate in the same way, the urge to be careful is not so pressing. See *Warranties of Kind and Quality,* 57 Yale L J 1389, 1400 (1948). [*Henningsen v Bloomfield Motors, Inc, supra,* 388-391.]

chased the amount of automobile liability insurance that they thought they needed having in mind their economic status. There is no reason to suppose that they connived with their fathers to have them purchase only the statutorily required policy limits or that the insurers were somehow or other taken advantage of when Gloria Carlson or Myron Wisniewski were driving their father's automobile.

Yet the household exception as written would deny Gloria Carlson and Myron Wisniewski portable coverage—ordinarily applicable whenever they might drive an automobile belonging to someone else—when occasionally driving their fathers' automobiles simply because they resided with him. In the situation perhaps most likely to occur, occasional use of an automobile belonging to a family member residing in the same household, one's own policy is without force or effect. In the companion case of *Deyarmond,* the policy issued by Community Service Insurance Company, and in the companion case of *Ruuska,* the policy issued by Farm Bureau Mutual Insurance Company of Michigan, would exclude portable coverage when occasionally driving any relative's automobile without regard to whether the relative resides in the same household.[5]

Much has changed since the household exception was devised a long time ago when it was not typical for there to be as many automobiles as there now are in a family. It is commonplace today for parents to require their children who continue to reside in the household who wish to have their own automobiles to earn the money needed to provide that luxury. The parent may continue to provide room and board, but the parent is not

[5] See ns 3 and 8.

involved in the child's automobile. The child pur-
chases the automobile, keeps or fails to keep up
the payments, has it repaired and is responsible
for insuring it. In that very typical situation,
neither the parents nor siblings should ordinarily
be treated as at fault if the child fails to purchase
or keep up the premium payments on the vehicle.
In households with two earners there frequently
will be situations where, although the two earners
may be married, there will be separate bank ac-
counts and separate responsibility for purchase of
automobiles and automobile liability insurance.

This Court should decline to enforce as uncon-
scionable an insurance industry practice that in
effect makes parents, spouses, and children respon-
sible to see to it that others in the household keep
their automobiles insured and that premiums are
timely paid, and that would exclude coverage, in
the policy limits they have provided for themselves
and other members of the household, while driving
or occupying a vehicle owned by the other house-
hold member, even if, as in *Ruuska* and the com-
panion case of *Dennison,* that vehicle is insured.

In *Ruuska,* 351-352, I wrote:

> The exclusion from coverage is apparently de-
> signed to guard against a person having coverage
> on one vehicle and no coverage, or less coverage,
> on another vehicle owned by him or regularly used
> by him. The exclusion seeks to protect the insurer
> against a policyholder failing to buy coverage on
> another vehicle *he owns.* To be effective, the provi-
> sion must exclude an uninsured vehicle registered
> in the name of another that the insured regularly
> uses—*a leased automobile.* The exclusion is to this
> extent clearly reasonable and conscionable.
>
> The exclusion is written so broadly, however,
> that it encompasses situations beyond the evil it is
> designed to guard against. In seeking to protect

itself against overreaching by the insured, the insurer has overwritten the exclusion and failed to protect the insured who acts in good faith. The exclusion is aimed at a particular evil; it goes beyond reason and good conscience to exclude liability beyond the need for the exclusion.

When a court limits such an exclusion, it is subject to the charge that it is rewriting the policy. Implicit in the charge is the assumption that the insurer can draft the policy as it sees fit. Its power to do so is, however, restricted by the doctrines of unconscionability and reasonable expectations.[22]

* * *

An insured cannot purchase a rider deleting or a specific exception from the exclusion unless the insurer is willing to and offers to delete or make a specific exception upon payment of an additional premium. Nor can the insured reasonably be expected to purchase insurance on each automobile belonging to a relative or employer that he might potentially drive and on the automobiles of each neighbor or co-worker which a jury might decide he "frequently" or "regularly" uses.

---

[22] See Keeton, Basic Text on Insurance Law, §§ 6.2, 6.3, pp 348-361; see also Atiyah, The Rise and Fall of Freedom of Contract (Oxford University Press, 1979), pp 731, 734.

---

A reasonable person would not expect the amount of liability coverage that he considers appropriate and purchased will not be in effect when he drives a family member's automobile with the result that insurance protection is reduced to whatever amount of liability coverage, if any, the family member chose to purchase.

II

*Powers v DAIIE* concerns the uninsured motorist coverage.

Wanda Powers was a passenger in her sister's uninsured automobile. Her sister's automobile was struck by another uninsured automobile. Both sisters lived with their mother who had purchased uninsured motorist coverage, $20,000/$40,000.

For purposes of uninsured motorist coverage, the term insured was defined as meaning the individual insured named in the policy (the mother, Louise Powers) and "while residents of the same household of such individual, the spouse and relatives of either."

. . The policy excludes from uninsured motorist coverage bodily injury to an insured, i.e., including Wanda Powers, while occupying an automobile other than the insured vehicle and a nonowned automobile to which there is not applicable and available uninsured motorist coverage, but defines nonowned automobile in the same way the term is defined for residual liability purposes, namely as meaning an automobile "not owned by, furnished or available for the regular or frequent use of the named insured, relative or other resident of the same household of such named insured."

The sister who owned an automobile and who did not choose to purchase any insurance should not be deemed to be a relative covered by the policy while driving or occupying her uninsured vehicle.[6] Like Gloria Carlson and Myron Wisniewski, she had the "coverage"—no coverage—she chose to have.

The sister who was injured should, however, be viewed much as the New Jersey Supreme Court viewed Henningsen's wife, who was driving her husband's defective automobile and who, although not the purchaser or owner of the vehicle, never-

---

[6] That sister was not injured. She had left the vehicle, which had become stalled, and had gone for aid before her automobile was struck by another uninsured motor vehicle.

theless was permitted to bring an action based on
an implied warranty of merchantability. The in-
surer chose to sell uninsured motorist coverage for
the benefit not only of the named insured, but also
for the benefit of a spouse and relative residing in
the same household. The mother, Louise Powers,
and the injured sister, Wanda Powers, are there-
fore essentially in the same position vis-à-vis the
insurer.

For the reasons set forth in *Ruuska* and in this
opinion regarding the companion case of *Dennison,*
the insurer cannot conscionably be permitted to
exclude from uninsured motorist coverage loss
incurred while riding in a relative's automobile
that is uninsured.[7]

Louise Powers purchased for herself and her
daughter the uninsured motorist protection she
thought was needed, and could not reasonably
have expected the coverage to be inapplicable
because the uninsured motorist struck while her
daughter was riding in her other daughter's auto-
mobile.

The household exception would apply without
regard to whether the automobile of the family
member is insured. In all events, there is no
reason to suppose that Wanda Powers or her
mother Louise Powers were complicit in the other
daughter's automobile being uninsured. Possibly if
they were complicit in some substantial way they
should not be able to recover. Then perhaps the
evil at which the household exception is aimed
would have occurred.

### III

Ester Deyarmond owned a 1978 Fairmont auto-

---

[7] The injury was not caused by negligence of the sister who had not
insured her automobile, but rather by the negligence of a driver of
another uninsured automobile.

mobile insured for $20,000/$40,000 with Citizens
Insurance Company. At the time of the accident, it
was being driven by her son, William, who ran a
stop sign, causing an accident which killed five
persons. Citizens paid the policy limits of $40,000.

Ester Deyarmond commenced this action against
Community Service Insurance Company which had
insured a 1980 Mustang owned by her son, Steven.
Ester Deyarmond was the named insured on the
policy issued by Community Service covering the
Mustang. Ester Deyarmond, being the named in-
sured, somewhat confuses but does not change the
essence of the matter because she was also a
covered insured as a relative in respect to the
nonowned Mustang. Both Steven Deyarmond, in
whose name the Mustang was registered, and
William Deyarmond, the driver of the Fairmont at
the time of the accident, lived with their mother
in the same household.

The issue, as in the other cases, concerns the
nonowned automobile definition. The residual lia-
bility coverage under the Community Service pol-
icy covering the Mustang, $25,000 per person/$50,-
000 per occurrence, applies to liability arising out
of the ownership, maintenance, or use of an owned
automobile or any nonowned automobile. But non-
owned automobile is defined as meaning an auto-
mobile "not owned by or furnished for the regular
use of either the named insured or any relative,
other than a temporary substitute automobile."[8]

On the same analysis that persuades me that
Gloria Carlson in *Ruuska* was, and Myron Wis-
niewski in the companion case of *Dennison* should
be, entitled to the full protection of the policy

[8] Here as in *Raska,* see n 3 *supra,* the term relative is not limited to
a relative residing in the same household. Community Service, as well
as Farm Bureau, broadened its exclusion to include cousins and in-
laws.

limits they purchased when they were driving their fathers' automobiles, Ester Deyarmond could not reasonably expect coverage in an amount greater than she chose to purchase on her Fairmont automobile.

If William had brought this action rather than Ester, he probably would be entitled to the benefit of the coverage on the Mustang. He, like Wanda Powers, was a relative residing in the same household as another family member, his brother Steven and his mother Ester. William and Steven were, under the terms of the policy issued on the Mustang, insureds. There is no reason to suppose that William was complicit with his mother or Steven in obtaining less coverage on the Fairmont than on the Mustang.

William, however, is not the plaintiff in this action. Ester is the plaintiff, and it was she who chose the $20,000/$40,000 limits for the Fairmont.[9]

IV

In *Nicholson,* the driver was Keith Kron. He was driving his sister's automobile which was insured with DAIIE. Two persons were killed. DAIIE paid the policy limits of a $25,000/$50,000 policy, i.e., $50,000. Karen and Keith lived with their parents, each of whom owned an automobile that was also insured with DAIIE with the same policy limits of $25,000/$50,000.

In this action, DAIIE seeks a declaration that neither Karen nor Keith have any recourse under the parents' policies and thus the Nicholson estate is not covered under the parents' policies. The definition of named insured would have included Keith but not Karen; the term relative, for purposes of defining who is a named insured as to a nonowned automobile, is defined as including any

---

[9] It was Ester Deyarmond who insured the Mustang through another insurance company at greater policy limits, $25,000/$50,000.

relative who does not own an automobile. The term nonowned automobile is defined, essentially, as it is in the policies in the companion cases.

There are two possible bases of liability, the owner's liability and the driver's liability. DAIIE discharged its obligation in respect to the owner's (Karen's) liability when it paid $50,000. As to Keith's liability as driver, he is, because DAIIE chose to market its policies to include relatives, at least when not driving another household member's automobile, an insured. For the same reason Wanda Powers is covered under her mother's policy without regard to the household exception, Keith is covered under his parents' policies without regard to that exception. The insurer's exposure is, however, limited to two coverages because there are only two possible bases of liability, owner and driver.

In sum, if Karen had been driving, she could look to DAIIE only for $25,000/$50,000, the policy limits she chose—she could not expect additional "stacking" protection as a relative residing in her parents' household. Keith, as an insured under the DAIIE policy, is entitled in respect to his liability as a driver at most to one additional $25,000/$50,000 coverage.

The briefs and arguments have in the main focused on the household exception to the non-owned automobile and uninsured motorist provisions of the automobile's insurance policy. The "stacking" question implicates the "other insurance" clause set forth in most, perhaps all, automobile insurance policies. The lead opinion notes that the insurers "do not claim that their policies contain other-insurance clauses, but instead rely on the owned-vehicle exclusion to prevent stacking in cases in which an insured is driving an automobile owned by a resident relative."[10]

----

[10] *Ante,* p 635.

Since the applicability of the "other insurance" clause has not been briefed and argued and is not dealt with in the lead opinion the stacking question cannot be definitively decided in these cases.[11]

V

*Schiebout* presents a somewhat different issue. In this case, I would remand for further factfinding on whether the uninsured truck was furnished to or available for the regular use of the named insured, plaintiff Herman James Schiebout.

Schiebout owned two automobiles that he had insured with Citizens. At the time of the accident, he was driving a dump truck owned by Recreational Center of Kent, Inc. It is alleged that Recreational Center had permitted Schiebout to use the truck and that it was thus a vehicle furnished or available for his regular use and accordingly excluded as a nonowned automobile. That presents a factual question.

It is conscionable for an insurer to exclude coverage in respect to regular use of a nonowned vehicle by the insured if such regular use is such as to constitute the evil at which the exclusion is aimed, namely, purchasing insurance on one vehicle and seeking coverage without further premium payment on a second vehicle regularly used.

There is still another issue, whether residual liability coverage can, consistent with the no-fault automobile liability act, be excluded as to an uninsured nonowned automobile. This was the issue that the Court reserved in *DAIIE v Widling, supra.*[12] The issue is, as set forth in *Widling,* complicated by the changing statutory pattern. The issue is not addressed in the lead opinion and no opinion is expressed thereon.

---

[11] *Civil Service Comm v Dep't of Labor,* 424 Mich 571, 609; 384 NW2d 728 (1986).

[12] See n 2.