**Michigan Supreme Court**
Lansing, Michigan 48909

# Opinion

Chief Justice
Maura D. Corrigan

Justices
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

**FILED JULY 16, 2003**

KAY WILKIE, Personal Representative
of the ESTATE OF PAUL K. WILKIE,
Deceased, and Janna Lee Frank,

    Plaintiff-Appellees,

v
                                    No. 119295

AUTO-OWNERS INSURANCE COMPANY,

    Defendant-Appellants.

_____

**BEFORE THE ENTIRE BENCH**

**TAYLOR, J.**

    This case involves a dispute between Auto-Owners Insurance Company and its insureds, Janna L. Frank and the decedent, Paul K. Wilkie, regarding underinsured-motorist coverage.[1] Defendant Auto-Owners argues that plaintiffs Frank and Wilkie's[2] recoveries from Auto-Owners are limited under the terms of the policy to $50,000 each. Frank and Wilkie argue that they are each owed $75,000. The trial court and Court of Appeals agreed with Frank and Wilkie. We reverse.

_____

[1]The policy holder was Wilkie's mother, Kay Wilkie.

[2]The personal representative of Paul Wilkie's estate, Kay Wilkie, is the plaintiff in this case.

# I. Facts

On April 17, 1996, Janna Frank was driving east on Maple Rapids Road in Clinton County, with Paul Wilkie as a passenger. At the same time, Stephen Ward was driving west on Maple Rapids Road. Witnesses described his driving as erratic shortly before his vehicle crossed the center line and collided with Frank's car, injuring her and causing the deaths of Ward and Wilkie.

Ward's vehicle was insured under a Citizens Insurance Company no-fault automobile-insurance policy having limits of $50,000. Wilkie's estate and Frank shared this sum, with each receiving $25,000. Wilkie's vehicle was insured under an Auto-Owners no-fault automobile-insurance policy that provided, in addition to the mandatory coverages required under Michigan's no-fault automobile-insurance statute, MCL 500.3101 *et seq.*, an optional coverage described as underinsured-motorist coverage. Speaking generally, this coverage was intended to supplement insurance proceeds received by the insured from the tortfeasor had the tortfeasor not been underinsured. This added coverage had limits of $100,000 for each person to a total of $300,000 for each occurrence, and also provided that Auto-Owners' liability was limited to the amount by which these limits exceeded the underinsured motorist's own insurance coverage. The policy clearly stated that the Auto-Owners' limits of liability were not to be increased because of the number of persons injured,

claims made, or automobiles involved in the accident.[3]

Auto-Owners did not contest that the accident was Ward's fault and agreed that both Wilkie's and Frank's damages were at least $100,000. Disputed, however, was the total amount due from Auto-Owners to Wilkie and Frank. Auto-Owners

_____

[3]The relevant portions of the contract provide as follows:

2.   COVERAGE

a.   We will pay compensatory damages any person is legally entitled to recover:

(1)   from the owner or operator of an underinsured automobile;

(2)   for bodily injury sustained while occupying or getting into or out of an automobile that is covered by Section II—LIABILITY COVERAGE of the policy.

* * *

4.   LIMIT OF LIABILITY

a.   Our Limit of Liability for Underinsured Motorists Coverage shall not exceed the lowest of:

(1)   the amount by which the Underinsured Motorist Coverage limits stated in the Declarations exceed the total limits of all bodily injury liability bonds and policies available to the owner or operator of the underinsured automobile; or

(2)   the amount by which compensatory damages for bodily injury exceed the total limits of those bodily injury liability bonds and policies.

b.   The Limit of Liability is not increased because of the number of:

(1)   automobiles shown or premiums charged in the Declarations;

(2)   claims made or suits brought;

(3)   persons injured; or

(4)   automobiles involved in the occurrence.

3

asserted that it only owed Wilkie and Frank $50,000 each. As it understood the contract terms, the $100,000 policy limit would be reduced by the $50,000 coverage of the Ward policy. Wilkie and Frank, for their part, claimed that Auto-Owners owed each of them $75,000. They reasoned that, having equally split the Ward policy limits of $50,000, only the $25,000 they received should have been subtracted from the $100,000 policy limit to determine the amount each was due.

Unable to reach a resolution of this dispute, Wilkie and Frank sought declaratory relief against Auto-Owners in the Clinton Circuit Court. The plaintiffs moved for summary disposition predicated on their understanding of the contract's requirements. The trial court granted their motion and ruled that only the amount actually received by each of them, $25,000, and not the entire amount of Ward's policy limits, $50,000, should be set off against the amount available to them, $100,000, under the underinsured-motorist provision. Thus, according to the trial court, Wilkie and Frank were each entitled to $75,000 from Auto-Owners.

Auto-Owners appealed, and the Court of Appeals[4] held that the language of the Auto-Owners policy was ambiguous in directing how to apply the underinsured policy limit as a setoff against the amounts Auto-Owners owed. That is, Auto-Owners' or the insured's readings were equally plausible, or as the Court described it, the contract, in this particular, could be interpreted in "at least two ways . . . ." *Id*. at

---

[4]245 Mich App 521; 629 NW2d 86 (2001).

527. Pursuant to the doctrine of interpreting an ambiguous contract against the drafter,[5] it construed the language that it found unclear against the drafter and in favor of the insureds. *Id*. Thus, each claimant was awarded $75,000. The Court bolstered this by stating that the conclusion was the same as one that a utilization of the doctrine of "reasonable expectations" would produce. The Court determined the reasonable expectation of an insured with a similar policy was to expect to always be able to predict with certainty how much coverage will be available from an underinsured motorist. Accordingly, to allow the insurer to utilize variables such as the number of claimants, automobiles involved, claims made, or suits brought to alter the amount due the insured would run the contract afoul of those expectations. To preclude this occurring, the Court concluded that the Court's duty was to conform the contract to what it had determined was reasonable to expect in a contract of this sort. In this case, that meant that on the basis of variables such as those mentioned above, which were, in fact, included in the Auto-Owners policy, Auto-Owners could not alter the insured's recovery. The sum of this argument was to return the Court's consideration to the clauses they had already determined were ambiguous, and, thus, to the earlier conclusion that Auto-Owners was required to pay Wilkie and Frank $75,000 each.

---

[5]*Klapp v United Ins Group Agency, Inc*, 468 Mich 461; ___ NW2d ___ (2003); *Raska v Farm Bureau Ins Co*, 412 Mich 355, 362; 314 NW2d 440 (1982).

We granted Auto-Owners leave to appeal.[6]

## II. Standard of Review

The proper interpretation of a contract is a question of law, which this Court reviews de novo. *Archambo v Lawyers Title Ins Corp*, 466 Mich 402, 408; 646 NW2d 170 (2002). The same standard applies to the question of whether an ambiguity exists in an insurance contract. *Farm Bureau Mut Ins Co v Nikkel*, 460 Mich 558, 563; 596 NW2d 915 (1999). Accordingly, we examine the language in the contract, giving it its ordinary and plain meaning if such would be apparent to a reader of the instrument. *Bianchi v Automobile Club of Michigan,* 437 Mich 65, 71 n 1; 467 NW2d 17 (1991).

## III. Analysis

### A

Under the language of the underinsurance policy at issue here, the insurer agreed to pay $100,000[7] for each person to a total of $300,000 for each occurrence for bodily or compensatory damages to individuals covered by the policy if each person would have been entitled to recover all those sums from the other driver, but was precluded from doing so because the other driver was underinsured (¶ 1[a] and [b]).[8] The

---

[6]467 Mich 867 (2002).

[7]The actual policy language states "*$100,00 person/$300,000 occurrence*" (emphasis added). That this is a typographical error is clear because the parties agree that the policy actually refers to limits of *$100,000* per person.

[8]Under ¶ 1(a) and (b) of Wilkie's policy with Auto-Owners, an underinsured automobile

> [i]s an automobile to which a bodily injury liability bond or policy applies at the time of the

6

insurer's liability was then limited by a provision (¶ 4[a][1] and [2]) that states that the amount by which the $100,000 for each person to a total of $300,000 for each occurrence exceeds the total limits available to the owner or operator of the underinsured vehicle will determine the amount to be paid.[9] Further clarity is given to this clause by the next provisions (¶ 4[a][2] and [3]), which say that the amounts available are not increased because of the claims made or persons injured.[10]

occurrence:

    a.  In at least the minimum amounts required by [state law]; and

    b.  In which the limits of liability are less than the amount of damages the injured person is legally entitled to recover for bodily injury.

Paragraph 2(a)(1) of the contract states that Auto-Owners "will pay compensatory damages any person is legally entitled to recover . . . from the owner or operator of an underinsured automobile."  See n 3 where this provision is set out in contex

[9]The limiting language of the policy, ¶ 4(a), states:

    (1)  the amount by which the Underinsured Motorist Coverage limits stated in the Declarations exceed the total limits of all bodily injury liability bonds and policies available to the owner or operator of the underinsured automobile; or

    (2)  the amount by which compensatory damages for bodily injury exceed the total limits of those bodily injury liability bonds and policies.

See n 3 where this provision is set out in context.

[10]Paragraph 4(b) of the policy states:

    b.  The Limit of Liability is not increased because of the number of:

* * *

    (2)  claims made or suits brought;

(continued...)

7

The Court of Appeals, as urged by the plaintiffs, approached this language by holding that ¶ 4(a)(1) of the contract was ambiguous because it could be "reasonably understood in differing ways." 245 Mich App 524. That is, ¶ 4(a)(1) of the contract could be interpreted to direct that the $100,000 from the Auto-Owners policy be reduced by either $50,000 or $25,000, depending on how one chose to read it. That being the case, the Court construed the contract against its drafter, Auto-Owners. The Court's ambiguity analysis of the language of ¶ 4(a)(1) is, at best, questionable because the language appears clearer than the Court found it to be. Paragraph 4(a)(1) states that the limit of liability for underinsured-motorist coverage shall not exceed "the amount by which the Underinsured Motorist Coverage limits stated in the Declarations exceeds the *total limits* of all bodily injury liability bonds and policies *available to the owner* or operator of the underinsured automobile . . . ." (Emphasis added.) In this case, the underinsured-motorist coverage limit stated in Auto-Owner's declaration is $100,000. The *total limit* of all bodily-injury liability policies *available to the owner* of the underinsured automobile, i.e., Ward, is $50,000. Therefore, the amount by which the underinsured-motorist-coverage limits stated in the declarations exceeds the total limits of all bodily-injury policies available to the owner of the underinsured automobile is clearly $50,000,

_____

(...continued)

    (3) persons injured . . . .

See n 3 where this provision is set out in context.

8

not $75,000. Contrary to the contention of Court of Appeals, this provision cannot be "reasonably understood" to be referring to the amount actually received by the claimant because the provision specifically refers to the *total* available to the *owner*. Yet, whatever the merits of the Court of Appeals analysis, the panel's conclusion is fatally undermined when ¶ 4(a)(1) is read, as it must be,[11] with ¶¶ 4(b)(2) and (3). These later paragraphs settle any perceived ambiguity in ¶ 4(a)(1) by stating that the amounts to be paid will not be increased because of claims made, suits brought, or persons injured. Interpreting this provision to mean that each plaintiff is entitled to $75,000 would increase the limit of liability "because of" the number of claims brought or persons injured, which is clearly contrary to the plain language of ¶¶ 4(b)(2) and (3).[12]

Quite simply, if ¶ 4(a)(1) appears ambiguous by itself, when read with ¶¶ 4(b)(2) and (3) the ambiguity is eliminated. That being the case, the insurance contract at issue is unambiguous and should be enforced as its terms dictate. Thus, no consideration of the doctrine of construing the contract against the drafter is appropriate.

---

[11]We read contracts as a whole, giving harmonious effect, if possible, to each word and phrase. *Singer v Goff*, 334 Mich 163, 168; 54 NW2d 290 (1952).

[12]If there were only one claimant, Auto-Owners' limit of liability would clearly be $50,000. Plaintiffs argue, however, that because there are two claimants, Auto-Owners' limit of liability is $75,000. This cannot be true because the policy specifically states that Auto-Owners' limit of liability shall not increase "because of" the number of claimants.

The Court of Appeals, in declining to give the contract the construction ¶¶ 4(b)(2) and (3) compel, also relied on the argument that to allow such a construction would defy the insured's reasonable expectations, which, as the Court characterized them, would be that no change in the amount due would be occasioned by the vicissitudes of such things as claims made or persons injured.

This approach, where judges divine the parties' reasonable expectations and then rewrite the contract accordingly, is contrary to the bedrock principle of American contract law that parties are free to contract as they see fit, and the courts are to enforce the agreement as written absent some highly unusual circumstance, such as a contract in violation of law or public policy. This Court has recently discussed, and reinforced, its fidelity to this understanding of contract law in *Terrien v Zwit*, 467 Mich 56, 71; 648 NW2d 602 (2002). The notion, that free men and women may reach agreements regarding their affairs without government interference and that courts will enforce those agreements, is ancient and irrefutable. It draws strength from common-law roots and can be seen in our fundamental charter, the United States Constitution, where government is forbidden from impairing the contracts of citizens, art I, § 10, cl 1.[13] Our own state constitutions over the years of statehood have

---

[13]"No state shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ."

similarly echoed this limitation on government power.[14]  It is, in short, an unmistakable and ineradicable part of the legal fabric of our society.  Few have expressed the force of this venerable axiom better than the late Professor Arthur Corbin, of Yale Law School, who wrote on this topic in his definitive study of contract law, *Corbin on Contracts*, as follows:

> One does not have "liberty of contract" unless organized society both forbears and enforces, forbears to penalize him for making his bargain and enforces it for him after it is made. [15 Corbin, Contracts (Interim ed), ch 79, § 1376, p 17.]

In contrast to this legal pedigree extending over the centuries, the rule of reasonable expectations is of recent origin.  Moreover, it is antagonistic to this understanding of the rule of law, and is, accordingly, in our view, invalid as an approach to contract interpretation.

The rule of reasonable expectations had innocent origins in 1970.  Professor Robert E. Keeton of Harvard Law School wrote an article entitled *Insurance law rights at variance with policy provisions,* 83 Harv L R 961, 967 (1970), in which he examined and attempted to rationalize a number of cases in which the results appeared to defy the principle that contracts will be construed according to their unambiguous terms.  To explain this phenomenon, as best he could, he concluded that certain courts would evidently not enforce clear contract language in the face of one of the parties' "reasonable expectations" of coverage.  As Professor Keeton described it:

---

[14]See, for example, Const 1963, art 1, § 10.

11

The objectively reasonable expectations of the applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provision would have negated those expectations. [*Id.*]

Whether Professor Keeton intended this analysis to spawn a frontal assault on the ability of our citizens to manage, by contract, their own affairs, it had that effect because numerous courts, to one degree or another, adopted some form of the rule.[15]

---

[15]Writing in 1990, Professor Roger C. Henderson of the University of Arizona School of Law discussed the development of the doctrine in the years after 1970. See Henderson, *The doctrine of reasonable expectations in insurance law after two decades*, 51 Ohio St L J 823, 827-838 (1990), outlining the development of the doctrine. According to Professor Henderson, the following ten jurisdictions have clearly adopted the rule: *Lambert v Liberty Mut Ins Co*, 331 So 2d 260, 263 (Ala, 1976); *Stewart-Smith Haidinger, Inc v Avi-Truck, Inc*, 682 P2d 1108, 1112 (Alas, 1984); *Gordinier v Aetna Cas & Surety Co*, 154 Ariz 266, 272; 742 P2d 277 (1987); *Smith v Westland Life Ins Co*, 15 Cal 3d 111, 121-122; 123 Cal Rptr 649; 539 P2d 433 (1975); *Farm Bureau Mut Ins Co v Sandbulte*, 302 NW2d 104 (Iowa, 1981); *Transamerica Ins Co v Royle*, 202 Mont 173; 656 P2d 820 (1983); *Nile Valley Coop Grain & Milling Co v Farmers Elevator Mut Ins Co*, 187 Neb 720; 193 NW2d 752 (1972) (construing standard fire policy); *Catania v State Farm Life Ins Co*, 95 Nev 532; 598 P2d 631 (1979); *Grimes v Concord Gen Mut Ins Co*, 120 NH 718; 422 A2d 1312 (1980); *Werner Industries, Inc v First State Ins Co*, 112 NJ 30; 548 A2d 188 (1988).

Professor Henderson notes that seventeen jurisdictions have adopted some form of the rule at various times: *Davis v MLG Corp*, 712 P2d 985, 986 (Colo, 1986); *Simses v North American Co for Life & Health Ins*, 175 Conn 77; 394 A2d 710 (1978); *Hallowell v State Farm Mut Automobile Ins Co*, 443 A2d 925 (Del, 1982); *Richards v Hanover Ins Co*, 250 Ga 613; 299 SE2d 561 (1983); *Fortune v Wong*, 68 Hawaii 1; 702 P2d 299 (1985); *Eli Lilly & Co v Home Ins Co*, 482 NE2d 467 (Ind, 1985); *Gowing v Great Plains Mut Ins Co*, 207 Kan 78; 483 P2d 1072 (1971) (applying reasonable expectations of insured as a rule for resolving ambiguities); *Simon v Continental Ins Co*, 724 SW2d 210 (Ky, 1986); *Cataldie v Louisiana Health Service & Indemnity Co*, 456 So 2d 1373 (La, 1984); *Baybutt Constr Corp v Commercial Union Ins Co*, 455 A2d 914 (Me, 1983), but see *Peerless Ins Co v Brennon*, 564 A2d 383 (Me, 1989) (reversing

(continued...)

Michigan has had a puzzling history with the doctrine. The first mention of the rule of reasonable expectations in Michigan was in *Zurich Ins Co v Rombough,* 384 Mich 228, 232-233; 180 NW2d 775 (1970), in which this Court held, unexceptionally, that ambiguous policy provisions in an insurance contract had to be construed against the insurance company and in favor of the insured. In the course of this

---

*Baybutt*); *Powers v Detroit Automobile Inter-Ins Exch*, 427 Mich 602; 398 NW2d 411 (1986); *Atwater Creamery Co v Western Nat'l Mut Ins Co*, 366 NW2d 271 (Minn, 1985) (Wahl, J., lead opinion); *Brown v Blue Cross & Blue Shield of Mississippi*, 427 So 2d 139 (Miss, 1983); *Davison v Business Men's Assurance Co of America*, 85 NM 796; 518 P2d 776 (1974); *Great American Ins Co v CG Tate Constr Co*, 177 W Va 734; 303 NC 387; 279 SE2d 769 (1981) rev'd on other grounds, 315 NC 714; 340 SE2d 743 (1986); *American Universal Ins Co v Russell*, 490 A2d 60, 62 (RI, 1985); *Nat'l Mut Ins Co v McMahon & Sons*, 177 W Va 734; 356 SE2d 488 (1987); *Garriguenc v Love*, 67 Wis 2d 130; 226 NW2d 414 (1975). Pennsylvania has taken an inconsistent approach. Compare *Standard Venetian Blind Co v American Empire Ins Co*, 503 Pa 300, 307; 469 A2d 563 (1983), which rejects the rule, with *Tonkovic v State Farm Mut Automobile Ins Co*, 513 Pa 445; 521 A2d 920 (1987), which accepts the rule.

For the purpose of fully understanding the rule, Professor Henderson also pointed out that ten jurisdictions have not adopted the rule: *Casey v Highland Ins Co*, 100 Idaho 505, 509; 600 P2d 1387 (1979); *Bain v Benefit Trust Life Ins Co*, 123 Ill App 3d 1025, 1032; 463 NE2d 1082 (1984); *Bond Bros v Robinson*, 393 Mass 546, 551; 471 NE2d 1332 (1984); *Walle Mut Ins Co v Sweeney*, 419 NW2d 176, 181 n 4 (ND, 1988); *Sterling Merchandise Co v Hartford Ins Co*, 30 Ohio App 3d 131, 135; 506 NE2d 1192 (1986); *Anderson v Continental Assurance Co*, 1983 Ok Civ App 25; 666 P2d 245, 248 (1983); *Allstate Ins Co v Mangum*, 299 SC 226, 231; 383 SE2d 464 (1989); *Keenan v Industrial Indemnity Ins Co*, 108 Wash 2d 314, 322; 738 P2d 270 (1987); *St Paul Fire & Marine v Albany Co School Dist 1*, 763 P2d 1255, 1263 (Wy, 1988).

The remaining jurisdictions, in Professor Henderson's opinion, have not addressed the issue, or, have managed to avoid ruling on it. See also *Max True Plastering Co v United States Fidelity & Guarantee Co*, 1996 Ok 28; 912 P2d 861, 863 n 5 (1996), for a discussion of the doctrine's acceptance.

13

holding, the Court cited a California Supreme Court case, *Gray v Zurich Ins Co,* 65 Cal 2d 263, 269-270; 54 Cal Rptr 104; 419 P2d 168 (1966), in which Justice Mathew Tobriner fleetingly referenced the rule of reasonable expectations.[16] Whatever the effect on California law *Gray* created, we must assume that our Court's use of the quotation was only to fully outline Justice Tobriner's position, because *Rombough* was decided on the basis of construing against the drafter and the remarks about the

_____

[16]     Justice Tobriner, writing for the California Supreme Court in [*Gray, supra*], construing similar provisions, said:

"In interpreting an insurance policy we apply the general principle that doubts as to meaning must be resolved against the insurer and that any exception to the performance of the basic underlying obligation must be so stated as clearly to apprise the insured of its effect.

"These principles of interpretation of insurance contracts have found new and vivid restatement in the doctrine of the adhesion contract.    As this court has held, a contract entered into between two parties of unequal bargaining strength, expressed in the language of a standardized contract, written by the more powerful bargainer to meet its own needs, and offered to the weaker party on a 'take it or leave it basis' carries some consequences that extend beyond orthodox implications.    Obligations arising from such a contract inure not alone from the consensual transaction but from the relationship of the parties.

"Although courts have long followed the basic precept that they would look to the words of the contract to find the meaning which the parties expected from them, they have also applied the doctrine of the adhesion contract to insurance policies, holding that in view of the disparate bargaining status of the parties we must ascertain that meaning of the contract which the insured would reasonably expect." [*Rombough, supra* at 232-233.]

14

rule of reasonable expectations were obiter dicta.

Nonetheless, *Rombough* is the case that opened the door to the rule of reasonable expectations in Michigan. The next case to address the issue is *Bradley v Mid-Century Ins Co*, 409 Mich 1, 60-61; 294 NW2d 141 (1980). Discussing a setoff provision in an insurance contract, the Court, in an equivocal passage of the opinion, held that "[t]he set-off clause, whether regarded as ambiguous or inconsistent with the rule of reasonable expectations of the insured, cannot be enforced as written." *Id*. Regarding Michigan authority, the *Bradley* Court cited *Rombough*. *Id*. at 61 n 69.[17]

By 1982, however, when this Court next addressed the rule in *Raska v Farm Bureau Ins Co*, 412 Mich 355, 362-363; 314 NW2d 440 (1982), a majority of the Court took pains to reject the rule of reasonable expectations. Justice Kavanagh, writing for the majority, pithily targeted the difficulty with the rule of reasonable expectations as follows:

> [T]he expectation that a contract will be enforceable other than according to its terms surely may not be said to be reasonable. If a person signs a contract without reading all of it or without understanding it, under some circumstances that person can avoid its obligations on the theory that there was no contract at all for there was no meeting of the minds.
>
> But to allow such a person to bind another to an obligation not covered by the contract as written because the first person thought the other was bound to such an obligation is neither reasonable nor just. [*Id.*]

Interestingly, the majority did not mention the *Bradley*

_____

[17]The Court also cited several of Professor Keeton's works, pointing out that the rule had been accepted in several jurisdictions. *Bradley*, *supra* at 61 n 69.

decision of only two years before. We surmise this was not an oversight, a finding reinforced by the fact that there had been no change in the composition of the Court in those two years. Rather, we conclude that the majority did not refer to *Bradley* because it reasoned that *Bradley* was premised on an ambiguity analysis or, perhaps, the requirement to conform automobile-insurance contracts to the requirements of the no-fault automobile-insurance act. Thus, it was probable that the majority considered any discussion of the rule of reasonable expectations in *Bradley* dicta, not requiring analysis. Buttressing this view is the fact that, Justice Williams, writing in dissent, invoked the rule of reasonable expectations, but never cited *Bradley* as support for his position. *Raska*, *supra* at 380.

This was not the end of the rule of reasonable expectations, however, because it was again mentioned in a plurality opinion in *Powers v Detroit Automobile Inter-Ins Exch*, 427 Mich 602, 631-635; 398 NW2d 411 (1986). In writing the plurality opinion[18], Chief Justice Williams cited *Raska* for the proposition that a reasonable expectation of a reader of the contract was enforceable. *Id*. at 631. This is a curious source of authority, as the *Raska* majority made no mention of that proposition. Moreover, breaking new ground, the *Powers* plurality also stated that the rule of reasonable expectations does not require an ambiguity as a prerequisite to the

---

[18]Justice Archer concurred with Chief Justice Williams, and Justices Cavanagh and Brickley concurred in the result only.

application of the doctrine. *Powers, supra* at 631 n 7.[19] For additional authority, the plurality relied on *Rombough* and *Bradley* for the limited proposition that insured parties do not have a reasonable expectation of coverage in the face of antistacking clauses in insurance contracts. The *Powers* plurality apparently misconceived the preceding Michigan cases regarding the acceptance in this state of the rule of reasonable expectations. In any case, whatever the *Powers* opinion's difficulties, it remains a plurality opinion and thus is not binding on subsequent courts. *People v Carines*, 460 Mich 750, 767 n 15; 597 NW2d 130 (1999).[20]

In 1991, in *Vanguard Ins Co v Clarke*, 438 Mich 463, 471-472; 475 NW2d 48 (1991), this Court again discussed the rule, agreeing with the *Powers* plurality and holding the rule to be an adjunct to the rules of construction of insurance contracts.[21] This was an unusual use of precedent because *Powers* was not binding and *Raska* was. Adding to the confusion, the Court characterized the "sole issue" in the case as whether to adopt the theory of dual or concurrent causality in insurance. *Vanguard, supra* at 465-466. This

---

[19]The plurality further referred to the rule of reasonable expectations as "[a]n adjunct to the rules of construction of insurance contracts . . . ." *Powers, supra* at 631.

[20]See also *Robinson v Detroit*, 462 Mich 439, 470 n 1; 613 NW2d 307 (2000)(Corrigan, C.J., concurring), and *People v Anderson*, 389 Mich 155, 170; 205 NW2d 461 (1973).

[21]The Court, however, declined to adopt the *Powers* plurality's view that the rule does not require an ambiguity in the contract as a prerequisite to its application. Instead, the *Vanguard* majority concluded that, without an ambiguity, there could be no application of the rule of reasonable expectations. *Id*. at 472-473.

issue was resolved without any need to delve into the doctrine of reasonable expectations, and, thus, discussion of reasonable expectations was merely dicta.

In the wake of *Vanguard*, this Court applied, but did not address the provenance of, the rule of reasonable expectations, apparently assuming it to be the law. See *Gelman Sciences, Inc v Fidelity Cas Co*, 456 Mich 305, 318; 572 NW2d 617 (1998)(citing *Vanguard* and *Powers*); *Fire Ins Exch v Diehl*, 450 Mich 678, 687; 545 NW2d 602 (1996)(citing *Powers*); and *Michigan Millers Mut Ins Co v Bronson Plating Co*, 445 Mich 558, 594 n 17; 519 NW2d 864 (1994)(citing *Powers* and *Vanguard*). Significantly, none of these cases mentions *Raska*.

We next discussed the rule of reasonable expectations in *Nikkel*. This Court approvingly cited *Raska* and, repudiating the *Powers* approach, stated:

> [W]e decline defendants' invitation to discern ambiguity solely because an insured might interpret a term differently than the express definition provided in a contract. "This court has many times held that one who signs a contract will not be heard to say, when enforcement is sought, that he did not read it, or that he supposed it was different in its terms." . . . To the extent that the plurality in *Powers* gleaned ambiguity by relying on an understanding of a term that differed from the clear definition provided in the policy, *Powers* is contrary to the most fundamental principle of contract interpretation—the court may not read ambiguity into a policy where none exists. [*Nikkel, supra* at 567-568.]

We concluded by holding that, while the rule of reasonable expectations was, at most, an adjunct to the rules of construction, there was no occasion to invoke it because, under *Vanguard,* it could only be utilized where there was an ambiguity in the contract, which was not present in *Nikkel*.

18

*Id.* at 568-569.

Viewing the puzzling thirty-three-year history of the rule of reasonable expectations in Michigan, we are confronted with a confused jumble of ignored precedent,[22] silently acquiesced to plurality opinions,[23] and dicta,[24] all of which, with little scrutiny, have been piled on each other to establish authority. At no point has an effort been made to establish priorities among the competing holdings. To bring order to this area of the law, it falls on us today to clearly articulate the status of the rule of reasonable expectations in this jurisdiction.

The rule of reasonable expectations clearly has no application to unambiguous contracts. That is, one's alleged "reasonable expectations" cannot supersede the clear language of a contract. Therefore, if this rule has any meaning, it can only be that, if there is more than one way to reasonably interpret a contract, i.e., the contract is ambiguous, and one of these interpretations is in accord with the reasonable expectations of the insured, this interpretation should prevail. However, this is saying no more than that, if a contract is ambiguous and the parties' intent cannot be discerned from extrinsic evidence, the contract should be interpreted against the insurer. In other words, when its application is limited to ambiguous contracts, the rule of

---

[22]*Raska.*

[23]*Powers.*

[24]*Rombough*, arguably *Bradley*, and *Vanguard*.

reasonable expectations is just a surrogate for the rule of construing against the drafter. As the Court of Appeals has recently explained:

> Well-settled principles of contract interpretation require one to first look to a contract's plain language. If the plain language is clear, there can be only one reasonable interpretation of its meaning and, therefore, only one meaning the parties could reasonable expect to apply. If the language is ambiguous, longstanding principles of contract law require that the ambiguous provision be construed against the drafter. Applied in an insurance context, the drafter is always the insurer. Thus, it appears that the "rule of reasonable expectations" is nothing more than a unique title given to traditional contract principles applied to insurance contracts . . . . [*Singer v American States Ins*, 245 Mich App 370, 381 n 8; 631 NW2d 34 (2002).]

Several commentators have expressed this same view. See Comment, *A critique of the reasonable expectations doctrine*, 56 U Chi L R 1461, 1468 (1989) (The rule of reasonable expectations "is identical to the practice of construing ambiguities against the insurer except that it purports to provide an additional justification for doing so, i.e., to satisfy the insured's reasonable expectations."); Popik & Quackenbos, *Reasonable expectations after thirty years: A failed doctrine*, 5 Conn Ins L J 425, 429 (1998)("Courts applying an 'ambiguity'-based version of the doctrine have apparently abandoned the doctrine as a rule of substantive law altogether, treating it instead as a rule of construction analogous to—indeed, virtually indistinguishable from—the *contra proferentem* doctrine."); Henderson, *The doctrine of reasonable expectations in insurance law after two decades*, 51 Ohio St L J 823, 827 (1990)("[D]ecisions using [the rule of

20

reasonable expectations] solely to construe [ambiguous] policy language do not support a new principle at all, but fall within the time-honored canon of construing ambiguities against the drafter of the contract-contra proferentem.").

In sum, the rule of reasonable expectations clearly has no application when interpreting an unambiguous contract because a policyholder cannot be said to have reasonably expected something different from the clear language of the contract. Further, it is already well established that ambiguous language should be construed against the drafter, i.e., the insurer. Therefore, stating that ambiguous language should be interpreted in favor of the policyholder's reasonable expectations adds nothing to the way in which Michigan courts construe contracts, and thus the rule of reasonable expectations should be abolished.

The rights and duties of parties to a contract are derived from the terms of the agreement. *Evans v Norris*, 6 Mich 369, 372 (1859). As this Court has previously stated, "The general rule [of contracts] is that competent persons shall have the utmost liberty of contracting and that their agreements voluntarily and fairly made shall be held valid and enforced in the courts." *Terrien, supra* at 71, quoting *Twin City Pipe Line Co v Harding Glass Co*, 283 US 353, 356; 51 S Ct 476; 75 L Ed 1112 (1931).[25] Under this legal principle, the parties are generally free to agree to whatever they like,

---

[25]"Freedom of contract is the general rule and restraint the exception." *Morehead v New York ex rel Tipaldo*, 298 US 587, 610-611; 80 L Ed 1347; 56 S Ct 918 (1936).

21

and, in most circumstances, it is beyond the authority of the courts[26] to interfere with the parties' agreement. *St Clair Intermediate School Dist v Intermediate Ed Ass'n*, 458 Mich 540, 570-572; 581 NW2d 707 (1998). Respect for the freedom to contract entails that we enforce only those obligations actually assented to by the parties. *Evans, supra* at 372. We believe that the rule of reasonable expectations markedly fails in this respect. The words of Justice Kavanagh bear repeating:

> [T]he expectation that a contract will be enforceable other than according to its terms surely may not be said to be reasonable. If a person signs a contract without reading all of it or without understanding it, under some circumstances that person can avoid its obligations on the theory that there was no contract at all for there was no meeting of the minds.
>
> But to allow such a person to bind another to an obligation not covered by the contract as written because the first person thought the other was bound to such an obligation is neither reasonable nor just. [*Raska, supra* at 362-363.]

Accordingly, we hold that the rule of reasonable expectations has no application in Michigan, and those cases that recognized this doctrine are to that extent overruled.

## IV. Conclusion

We reverse the judgment of the Court of Appeals and find the insurance contract between Auto-Owners and Wilkie unambiguously limited Auto-Owners' liability to $50,000 each for Wilkie and Frank.

---

[26]Duties imposed by courts are to be avoided in order to respect the freedom of parties to fashion agreements of their own design. See Comment, *A critique of the doctrine of reasonable expectations*, *supra* at 1487.

Clifford W. Taylor
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

**S T A T E   O F   M I C H I G A N**

**SUPREME COURT**

KAY WILKIE, PERSONAL REPRESENTATIVE
OF THE ESTATE OF PAUL K. WILKIE,
DECEASED, AND JANNA LEE FRANK,

    Plaintiff-Appellees,

v                                                      No.  119295

AUTO-OWNERS INSURANCE COMPANY,

    Defendant-Appellant.
_____

**WEAVER, J.** (*concurring in part dissenting in part*).

I concur with the majority that the rule of reasonable expectations "has no application when interpreting an unambiguous contract" and that "it is already well established that ambiguous language should be construed against the drafter, i.e., the insurer."  *Ante* at 25.

However, I dissent from the majority's determination that the underinsured-motorist provisions of the automobile-insurance contract at issue are unambiguous.  I would conclude that the policy is ambiguous and, therefore, construe it against the drafter.

The policy provides on its declarations page that Auto Owners' underinsured-motorist liability limit is $100,000 per person and $300,000 per occurrence.  However, the policy endorsement provides in pertinent part that "[t]he Limit of Liability is not increased because of the number of . . . persons injured . . . ."  While the declarations page appears

to base its underinsured premium on either a per person or a per occurrence maximum, the endorsement's language can be read as limiting liability to strictly a per occurrence maximum because it states the liability limit will not be increased by the number of persons injured.

On the facts of this case, under the per person interpretation, defendant is liable to each injured person covered by the underinsured-motorist provisions for $75,000, the per person limit ($100,000) minus the amount each person received from the underinsured motorist ($25,000). Under a per occurrence interpretation, defendant is liable to each injured person covered by the underinsured-motorist provisions for $50,000, the per person limit ($100,000) minus the total amount available from the underinsured-motorist for the occurrence ($50,000).

I would construe this ambiguity against the drafter and hold that each plaintiff is entitled to $75,000.

Elizabeth A. Weaver

KAY WILKIE, personal
representative of the estate
of PAUL K. WILKIE, deceased,
and JANNA LEE FRANK,

    Plaintiffs-Appellees,

v                                No. 119295

AUTO-OWNERS INSURANCE COMPANY,

    Defendant-Appellant.
_____

CAVANAGH, J. (*dissenting*).

    The majority holds today that an insured party's objectively reasonable expectations are no longer relevant in determining the meaning of an insurance contract. Because I would not discard the doctrine of reasonable expectations, I must respectfully dissent.

I

    The doctrine of reasonable expectations allows a court to contemplate the scope of insurance coverage anticipated by an insured party seeking benefits. Unlike the doctrine of *contra preferentem*, i.e., construing a document against the drafter, the reasonable-expectations doctrine is generally confined to the field of insurance law and, when correctly applied, is not

limited to those circumstances in which a document is clearly ambiguous on its face.[1]  Rather, the doctrine may assist a court in making the ambiguity determination, i.e., whether an insurance contract contains language that could reasonably be interpreted in two or more ways.[2]

Although courts normally limit the ambiguity inquiry to the four corners of a contract's text in other contexts, few have failed to recognize the unique character of insurance

---

[1] As I noted in my dissent in *Farm Bureau Mut In Co of Michigan v Nikkel*, 460 Mich 558, 571; 596 NW2d 915 (1999), an insurance company may not benefit from employing otherwise straightforward and unambiguous terms in a manner an insured could find confusing.  See also *Spaulding v Morse,* 322 Mass 149, 152-153; 76 NE2d 137 (1947):

> Every instrument in writing is to be interpreted, with a view to the material circumstances of the parties at the time of the execution, in the light of the pertinent facts within their knowledge and in such manner as to give effect to the main end designed to be accomplished. . . . [The] instrument is to be so construed as to give effect to the intent of the . . . [parties] as manifested by the words used illumined by all the attendant factors, unless inconsistent with some positive rule of law or repugnant to other terms of the instrument.  An omission to express an intention cannot be supplied by conjecture.  But if the instrument as a whole produces a conviction that a particular result was fixedly desired although not expressed by formal words, that defect may be supplied by implication and the underlying intention . . . may be effectuated, provided it is sufficiently declared by the entire instrument.  [Citations omitted.]

[2] See Holmes, *The Theory of Legal Interpretation,* 12 Harv L R 417, 418 (1899):

> [W]e let in evidence of intention not to help out what theory recognizes as an uncertainty of speech, and to read what the writer meant into what he has tried but failed to say, but recognizing that he has spoken with theoretic certainty, we inquire what he meant in order to find out what he has said.

agreements:

> There is no meeting of the minds except regarding the broad outlines of the transaction, the insurer's desire to sell a policy and the insured's desire to buy a policy of insurance for a designated price and period of insurance to cover loss arising from particular perils (death, illness, fire, theft, auto accident, "comprehensive"). The details (definitions, exceptions, exclusions, conditions) are generally not discussed and rarely negotiated. [*Lotoszinski v State Farm Mut Automobile Ins Co,* 417 Mich 1, 14 n 1; 331 NW2d 467 (1982) (Levin J., dissenting).]

See also Keeton, *Insurance law rights at variance with policy provisions,* 83 Harv L R 961 (1970), and cases cited therein.

Hence, in the context of such adhesion contracts, it is appropriate to consider not just the contractual text, but also the objectively reasonable expectations of the insured party and the circumstances surrounding the transaction.

In *Steven v Fidelity & Cas Co of N Y*, 58 Cal 2d 862; 27 Cal Rptr 172; 377 P2d 284 (1962), for example, appellant's husband purchased a life-insurance policy from a vending machine before leaving on a business flight. The insured was required to sign and mail the entire document before boarding the flight. The text of the contract, which could be fully reviewed only after purchase, contained an exception, prohibiting coverage for charter flights, while permitting coverage for reasonable methods of substitute transportation by land. On the return trip, appellant's husband was forced to make emergency arrangements on a charter flight. The insured died while traveling on the charter plane, and the insurer denied benefits.

On appeal, California's high court refused to enforce the

exclusion. The court held that a reasonable insured party would purchase such insurance expecting coverage for the entire trip, including any reasonable emergency substitute form of transportation. Because the contract did not *expressly* prohibit the type of substitute transportation utilized by the insured, though it did prohibit coverage for travel "on other than scheduled air carriers," *id*. at 866, a lay person could not reasonably be expected to foresee the force of the exclusion. Moreover, the court emphasized that the inanimate vending machine emitted a complex document that most people would be unable to decipher before boarding a plane. Likewise, the sticker on the face of the machine prohibiting coverage for nonscheduled air carriers could not aid the purchaser in weighing the benefits of the contract because the definition was buried in its text. *Id., supra* at 877. In support of this result, Justice Tobriner noted that "California courts have long been disinclined to effectuate clauses of limitation of liability which are unclear, unexpected, inconspicuous or unconscionable." *Id*. at 879, relying on *Raulet v Northwestern Nat'l Ins Co*, 157 Cal 213, 230; 107 P 292 (1910) (holding that insured parties would not be stringently bound to contract provisions because "[i]t is a matter almost of common knowledge that a very small percentage of policy-holders are actually cognizant of the provisions of their policies . . . . [I]n their numerous conditions and stipulations [insurance contracts] furnish[] what sometimes may be veritable traps for the unwary.").

Recognizing these same principles, dissenting Justice

4

Williams noted in *Raska v Farm Bureau Ins Co,* 412 Mich 355, 370; 314 NW2d 440 (1982):

> This Court is made up of human beings who are aware that very few insureds will try to read the detailed, cross-referenced, standardized, mass-produced insurance form, nor necessarily understand it if they do. Courts generally have gradually moved away from the traditional rule of *caveat emptor*, realizing that the modern insurance contract is not made between parties of equal bargaining strength with each side taking a part in choosing the language of the agreement and understanding what the contract means.

> Thus the approach we must take in examining insurance contracts such as the one in issue was accurately described by the New Jersey Supreme Court as follows:

> "An insurance policy, though in form a contract, is a product prepared and packaged by the insurer. The buyer scarcely understands the detailed content of what he is buying. When a court construes a policy, it cannot be indifferent to that reality." [*Raska,* quoting *DiOrio v New Jersey Manufacturers Ins Co,* 63 NJ 597, 602; 311 A2d 378 (1973).]

For these reasons, I must express my agreement with Justice Levin's approach in *Lotoszinski, supra* at 15-16:

> It is the historic responsibility of the courts to protect, in the exercise of the judicial power, against imposition in commercial transactions. Fairness is the proper inquiry where a court is assessing policy language marketed and purchased without negotiation or explanation of the scope of the coverage. [3] . . .

> The governing rule of law cannot rightfully be predicated on the assumption that [the plaintiff] would read the policy, that if she did read it she would or could understand its esoteric verbiage, anticipate the situation which developed and deduce that she was not covered. Many competent lawyers would, unless they set aside time for careful reading and reflection, have failed that exam.

---

[3] See *Bradley v Mid-Century Ins Co*, 409 Mich 1, 61; 294 NW2d 141 (1980); *DiOrio v New Jersey Manufacturers Ins Co,* [supra]; *C & J Fertilizer,*

*Inc v Allied Mutual Ins Co*, 227 NW2d 169, 175
(Iowa, 1975); *Hionis v Northern Mutual Ins Co*, 230
Pa Super 511, 516-517; 327 A2d 363, 365 (1974);
*Henningsen v Bloomfield Motors, Inc*, 32 NJ 358,
399-400; 161 A2d 69, 92 (1960); *Ady v West American
Ins Co*, 69 Ohio St 2d 593, 597; 433 NE2d 547, 549
(1982).

See also Keeton, Insurance Law, § 63, pp
350-351; 2 Restatement Contracts, 2d, § 208; 1
Corbin, Contracts, § 128, p 554; Grismore,
Contracts (Murray), § 294, p 508.

Though few would deny that the majority has artfully attempted to diminish the significance of this Court's jurisprudence with regard to the reasonable-expectations doctrine, it cannot be denied that, before today, Michigan joined the majority of states that integrated the doctrine into their jurisprudence.[3] In doing so, such jurisdictions did nothing more than recognize our timeworn rules of contract interpretation, i.e., contract formation requires a meeting of the minds.

Though I acknowledge that the majority's position is consistent with the notion that "free men and women may reach agreements regarding their affairs without government interference and that courts will enforce those agreements," *ante* at 12 citing *Terrien v Zwit*, 467 Mich 56, 71; 648 NW2d 602 (2002), I object to its attempt to distance itself from the policy choices inherent in its decision today. Simply put, the majority and I differ with regard to the policies

---

[3] See *Nikkel, supra* at 567. See also Stempel, *Unmet expectations: Undue restriction of the reasonable expectations approach and the misleading mythology of judicial role,* 5 Conn Ins L J 181, 191 (1998) (noting that "38 states 'have recognized some variation of the reasonable expectations doctrine.'").

that should guide the interpretation of insurance law. I would prefer not to disregard the manner in which the insurance industry operates. Though an adhesion contract may be a necessary ingredient in the trade, I cannot condone a doctrine of interpretation that all but ignores the potentially precarious effect on the bound party.

## II

In light of these standards, I cannot agree that the contract terms are free of ambiguity.[4]  Defendant insurer

---

[4] As the majority notes, the relevant portions of the insurance contract provide that Auto Owners underinsured motorist policy limit is $100,000 for each person and $300,000 for each occurrence. The policy endorsement provides as follows:

4.   LIMIT OF LIABILITY

a.   Our Limit of Liability for Underinsured Motorist Coverage shall not exceed the lowest of:

1.   the amount by which the Underinsured Motorist Coverage limits stated in the Declarations exceed the total limits of all bodily injury liability bonds and policies available to the owner or operator of the underinsured automobile; or

2.   the amount by which compensatory damages for bodily injury exceed the total limits of those bodily injury liability bonds and policies.

b.   The Limit of Liability is not increased because of the number of:

1.   automobiles shown or premiums charged in the Declarations;

2.   claims made or suits brought;

3.   persons injured; or

4.   automobiles involved in the occurrence.

c.   The amount we pay will be reduced by any amount paid or payable for the same bodily injury.
(continued...)

7

based its premium for underinsured-motorist coverage on a "per person" and "per occurrence" maximum. This portion of the contract, found on the declarations page, was among the few terms actually negotiated by the parties.

Even assuming the purchasing party read and understood the policy upon receipt (which often arrives weeks after the original purchase), review of the exclusions in section four suggests the insurer simply attempted to clarify that its liability was limited to making the insured whole, paying out no more than necessary to meet the limits on which the purchase price was based, i.e., $100,000 per person and $300,000 per occurrence.

If the insurer intended to limit coverage in the manner it now claims, it had a duty to expressly state not only that "coverage will not be increased," but also that coverage *may be decreased* from the coverage limits specifically negotiated. Instead of acknowledging this rational deduction, defendant insurer has asked this Court to pretend that *both* plaintiffs received the negligent party's maximum benefit ($50,000 per person or per accident), when in fact defendant insurer had previously *authorized* a settlement agreement wherein the injured plaintiffs split the negligent party's benefits, receiving only $25,000 each.

More specifically, the insurer's inclusion of ¶ 4(1)(a)-(b) merely assure that an insured will be reimbursed up to the policy limits on the declarations page, while clarifying no

------

[4](...continued)
. . .

8

windfall payments will be made, i.e., an insured will not receive duplicate reimbursement or payments exceeding the underinsured policy limits on the declarations page. Paragraph (4)(a)(1), for example, provides that an insurer will pay no more than the difference between policy limits. This clause clarifies that an insurer is simply obligated to make up the difference between benefits received from the underinsured party and the insurer. Though free of ambiguity when only one person is injured, the text's vagueness becomes evident when multiple insured parties are injured if the negligent party's policy has no separate per person and per occurrence coverage.

Further, the use of the term "available" is ambiguous, as noted by Justice Kelly in her dissent. While it is true in this case that the underinsured negligent motorist has $50,000 available for the total occurrence with no per person limit, it is impossible to conclude from the text of the contract at issue that the underinsured has $50,000 available *to pay each plaintiff,* though that is exactly the interpretation defendant asks this Court to adopt. By inserting text that ensures that payments for the same injuries are not duplicated, while simultaneously asking the Court—on the basis of the vague text—to assume that one limit could be paid out more than once, defendant has convinced this Court to further shift the balance of power in favor of insurance companies for the purpose of reducing an insurer's liability.

Properly interpreted, the computation required in ¶ 4(a)(1) should be the difference between the insurer's per

person limit ($100,000) and the underinsured's per occurrence limit *as actually received* (in this case, $25,000 per plaintiff). Similarly, if it were necessary to determine the per occurrence liability, the amount purchased by the underinsured motorist ($50,000) should be deducted from the amount of per occurrence coverage purchased from the insurer ($300,000).

Paragraph 4(a)(2) also supports a ruling in favor of plaintiffs. That paragraph clarifies that an insurer will pay benefits only for damages actually incurred, i.e., if an insured is hurt by a driver with a $40,000 per person policy limit and the insured incurs $60,000 in individual damages, the insurance company need pay only $20,000, assuming an insured has purchased a $100,000 per person underinsured-motorist policy. This clause makes clear the insurer will pay benefits to make an insured whole, but no more.

Paragraphs (4)(b)(1)-(4) also clarify that an insurer's liability will not be increased because of (1) the number of vehicles for which premiums are charged in the declaration, (2) the number of claims brought, (3) the number of people injured, or (4) the number of automobiles involved in an occurrence. On the basis of subsection (3) alone, one could logically infer that benefits should not *decrease* as a result of the number of people injured, i.e., if an insurer indicates a benefit will not be increased just because more than one person is injured, it is also reasonable to assume an insurer will not decrease benefits for the same reason.

This conclusion is buttressed by the fact that defendant

10

sold the underinsurance coverage for a limit of $100,000 per person and $300,000 per occurrence. This implies that at least three insured parties could be compensated up to the full per person limit if injured by an underinsured motorist. Instead, the majority has adopted an interpretation that prohibits full recovery where multiple parties are injured.

Finally, ¶ 4(c) clarifies that the benefits paid will be reduced by any amount actually "paid or payable for the same bodily injury." Again, this subsection ensures that an insured may not receive a duplicate payment for a single injury. The text of this clause suggests the reduction will be limited to that actually paid or logically payable for one particular injury. I am persuaded that the insurer's interpretation of its contract renders ¶ 4(c) generally superfluous and logically invalid. How can an insurer reduce benefits by any amount "payable" to two people for their injuries, where the "payable" amount—the res—cannot be paid to more than one person? The problems with the text in ¶ 4(c) echo the concerns raised with regard to ¶ 4(a)(1).

In sum, even if the insured purchaser actually reviewed the terms of the contract and all its exclusions, it would have remained impossible to anticipate the insurer's interpretation on the basis of the text of the contract purchased. Only when read in light of the underinsured negligent party's contract could one predict the majority's interpretation. Moreover, this interpretation ignores the significance of the sole negotiated term at issue in light of ¶ 4, which merely aims to clarify that the insured will be

made whole, but no more.  Therefore, in light of the manner in which the contract terms could be understood by a reasonable lay person, I would hold in favor of plaintiffs.

III

The roots of the doctrine of reasonable expectations run far deeper than the majority implies and could be properly characterized as nothing more than an overt attempt to clarify the scope of the parties' contract.  Applied in this case, I suspect even the most experienced analyst would have failed to predict the outcome affirmed by the majority.  Because the inquiry merely aids in the resolution of ambiguous insurance-contract terms, I must respectfully dissent and would affirm the decision of the Court of Appeals.

Michael F. Cavanagh<br/>
Marilyn Kelly

12

# S T A T E   O F   M I C H I G A N

## SUPREME COURT

KAY WILKIE, personal representative
of the ESTATE OF PAUL K. WILKIE,
deceased, and JANNA LEE FRANK,

    Plaintiffs-Appellee,

v                                                                No. 119295

AUTO-OWNERS INSURANCE COMPANY,

    Defendant-Appellant.

_____

KELLY, J. (*dissenting*).

I join Justice Cavanagh's dissenting opinion regarding the rule of reasonable expectations. I write separately to express my disagreement with the majority's holding that no ambiguity exists in the contract terms under consideration. Because I believe that the Court of Appeals properly found the terms of the policy ambiguous and properly construed them against defendant, their drafter, I would affirm.

### I

A contractual provision is ambiguous if reasonably susceptible to two different interpretations. *Farm Bureau Mutual Ins Co of Michigan v Nikkel*, 460 Mich 558, 566; 596 NW2d 915 (1999).

The disagreement in this case surrounds the

interpretation of the "limit of liability clause" in the underinsured motorist endorsement.  That provision states:

4.   LIMIT OF LIABILITY

a.   Our Limit of Liability for Underinsured Motorist Coverage shall not exceed the lowest of:

(1)   the amount by which the Underinsured Motorist Coverage limits stated in the Declarations exceed the total limits of all bodily injury liability bonds and policies available to the owner or operator of the underinsured automobile; or

(2)   the amount by which compensatory damages for bodily injury exceed the total limits of those bodily injury liability bonds and policies.

b.   The Limit of Liability is not increased because of the number of:

(1)   automobiles shown or premiums charged in the Declarations;

(2)   claims made or suits brought;

(3)   persons injured; or

(4)   automobiles involved in the occurrence.

Under this provision, plaintiffs may recover underinsured motorist benefits only up to the "Limit of Liability."  The "Limit of Liability" constitutes the difference between the $100,000 per person maximum and the liability amount "available to [Ward,] the owner or operator of the underinsured automobile."  Here, Ward's policy covered $50,000 worth of liability per occurrence.  Thus, Ward had available $50,000 for payment to those claiming against him.

Ambiguity results from the use of "available" in this contract.[1]  Webster's dictionary defines the term as

_____

[1]I note that the Court of Appeals in *Auto-Owners Ins Co v Leefers*, 203 Mich App 5; 512 NW2d 324 (1993), interpreting
(continued...)

2

1. suitable or ready for use; at hand . . . . 2. readily obtainable; accessible . . . . 3. free or ready to be seen, spoken to, employed, etc. . . . . 4. having sufficient power or efficacy; valid . . . . [*Random House Webster's College Dictionary* (1995).]

In a multiple claimant situation, these dictionary definitions support two interpretations of the word. First, "available" can mean the amount *actually* available to each claimant against Ward, considering that the claimants will split the benefits. Second, it can mean the amount *potentially* available to each claimant against Ward, as if only one claimant existed. Under the former interpretation, the insurance company should reduce the $100,000 per person limit by only $25,000, leaving a payment to each plaintiff of $75,000. Under the latter interpretation, the insurance company should reduce the $100,000 per person limit by $50,000, leaving a payment to each plaintiff of $50,000.

Given the reasonableness of both interpretations, the Court should affirm the decision of the Court of Appeals in

---

[1](...continued)
a different provision of an insurance contract written by the present defendant, found "available" to be ambiguous. The Court cited *Hoffman v United Services Automobile Ass'n*, 671 F Supp 922, 924-925 (D Conn, 1987), which commented upon the term as follows:

The word "available" could mean anything from "in hand" or "actually received" to "within reach" or "conceivably obtainable." . . . What is available, or accessible or obtainable, can range widely depending on what conduct or events are necessary to bring the tangible object into possession . . . . As the extent of those events or conduct is not defined, the word is ambiguous.

The *Leefers* Court defined the term to mean those funds actually or reasonably available to the insured. 203 Mich App 11-12.

holding this contract provision ambiguous.

II

The majority attempts to sidestep this ambiguity by relying on ¶ 4(b)(2) and ¶ 4(b)(3) to interpret the word "available" in ¶ 4(a).  According to the majority, "[t]hese later paragraphs settle any perceived ambiguity in ¶ 4(a)(1) by stating that the amounts to be paid will not be increased because of claims made, suits brought, or persons injured." *Ante* at 10-11.  The majority errs in relying on this provision.

Paragraph 4(b) does not state that the "amounts to be paid" will not be increased; rather, it states that the "Limit of Liability" will not be increased.  Though the difference is subtle, the structure of the contract provisions makes the difference critical to the contract's interpretation. Paragraph 4(a) defines the limit of liability.  Paragraph 4(b) prevents an increase in that limit, but says nothing at all about what the limit is in the first place.  It is in determining the limit of liability that we encounter the ambiguous term "available" and its several possible meanings.[2]

Thus, the provisions on which the majority relies fail to "settle any perceived ambiguity," *ante* at 10.  Because my examination of ¶¶ 4(b)(2) and (3) represents a reasonable interpretation of the contract provisions, it supports the conclusion that those provisions are ambiguous.

---

[2]Indeed, plaintiffs do not claim that the limit should be increased.  Rather, they argue that defendant erred in calculating the limit initially by setting it too low.

4

## III

In sum, the Court of Appeals properly held the contract terms to be ambiguous.  It was appropriate for the Court to construe them against defendant.  *Clevenger v Allstate Ins Co*, 443 Mich 646, 654; 505 NW2d 553 (1993).  Therefore, I would affirm the decision of the Court of Appeals.

Marilyn Kelly